920 F.2d 852
 136 L.R.R.M. (BNA) 2223, 59 USLW 2479,
117 Lab.Cas. P 10,479
 UNITED PAPERWORKERS INTERNATIONAL UNION, and Locals 265,
337, 1940 and 2650, Plaintiffs-Appellees, Cross-Appellants,
v.
INTERNATIONAL PAPER COMPANY, Defendant-Appellant, Cross-Appellee.
 No. 89-7581.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 10, 1991.
 
 William F. Gardner, and William K. Thomas, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for defendant-appellant cross-appellee.
 J. Cecil Gardner, Mobile, Ala. and Lynn Agee, Nashville, Tenn., for plaintiffs-appellees, cross-appellants.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before EDMONDSON and BIRCH, Circuit Judges, and RE*, Chief Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 In this labor-management dispute, defendant International Paper Company ("the Company") appeals a decision by the district court ordering arbitration of a severance pay dispute arising after the expiration of a collective bargaining agreement. The district court held that a binding, interim contract that included an obligation to arbitrate was created when, after the parties had reached a bargaining impasse in negotiations for a new agreement, the Company unilaterally implemented its final offer and plaintiff United Paperworkers International Union ("the Union")[1] agreed to continue working and not to strike without a ten-day notice. We AFFIRM the district court's grant of the Union's motion for summary judgment on the arbitrability of the severance pay dispute under a binding, interim contract between the Company and the Union.
 
 I.
 
 2
 The facts are largely undisputed. The Union has been certified since at least the early 1940s as the bargaining representative for the production and maintenance employees of the Company paper mill in Mobile, Alabama. When this lawsuit was filed, the most recent collective-bargaining agreement ("the Agreement") between the Union and the Company was effective from June 1, 1983, to May 31, 1986. By virtue of an automatic extension provision, the Agreement did not expire until February 26, 1987.
 
 
 3
 The basic format for the new collective-bargaining agreement negotiations, which started in October 1986, followed a pattern established more than forty years earlier and provided that a party desiring a new practice or change from the existing collective-bargaining agreement should identify the change or proposed amendment. If existing provisions were not the subject of a specific proposal for change or amendment, they were presumed to be acceptable as written and would become part of the new agreement. This practice was reaffirmed during the 1986-87 negotiations between the Company and the Union.
 
 
 4
 Relevant to this appeal, the provision on arbitration was the subject of a Union proposal for change. The Union asked that the new collective-bargaining agreement name a different national arbitration service to settle disputes between the Company and the Union. The Union negotiators specifically stated, however, that they were not proposing changes to the substance of the arbitration clause. On February 18, the parties agreed on a process for selecting arbitrators and specifically reaffirmed that there was agreement on the arbitration clause in its entirety.
 
 
 5
 On February 10, 1987, the Company gave the Union a ten-day notice of termination of the Agreement, to be effective February 21. By February 20, most areas of contention had been resolved. The principal area of dispute that remained was over the Company's proposal to abolish no-work holidays, premium pay on Sundays, and premium time for working holidays. On February 20, the Company made its "final offer," which included these Company-proposed changes, a ratification bonus, and a two-percent per-hour wage increase for certain employees. The Company's offer included the agreed-upon changes to the process of selecting arbitrators and proposed no changes to the substance of the arbitration clause in the existing Agreement. The Company gave the Union until midnight, February 26, to ratify the proposal.
 
 
 6
 According to the affidavit of chief Union negotiator Donald Langham, the Company also notified the Union at a February 20 meeting that the Company intended to implement unilaterally the Company's final offer if it was not ratified by March 6. Though unable to recall the exact words of the Union's response to the Company's plan to implement this final offer, Langham's uncontradicted testimony was that the Union negotiators "specifically told the company that we would continue working under the proposal they were going to implement." Langham further testified that it was also clearly understood by the parties that the final offer to be implemented included the following:
 
 
 7
 (1) the items agreed upon during negotiations which included the arbitration clause and severance pay clause, (2) the items in the 1983-1986 contract which were not the subject of a desire for change or amendment by either party, and (3) the items proposed by the company on which we did not have an agreement.
 
 
 8
 With the encouragement of the Union negotiating team, the Union membership rejected the Company's final offer by majority vote on February 26. On February 27, the Company wrote the Union and the employees, expressing disappointment over the rejection of its proposal. The letter also announced the following planned action by the Company:
 
 
 9
 [S]ince the contract has been officially terminated, it is the Company's intention to implement the terms of its offer of February 20, 1987, with the exception of the aforementioned ratification bonuses and the 2% wage increase provided for certain employees in the first year of the contract, such implementation to take place effective at 3:00 P.M., Friday, March 6, 1987.
 
 
 10
 We sincerely request that you take whatever action is necessary to obtain ratification of a new labor agreement prior to 3:00 P.M., March 6, 1987.
 
 
 11
 On March 2, the Company again wrote the Union and the employees, offering a slightly modified proposal and reaffirming the Company's intent to implement its February 20 offer unilaterally if a contract was not ratified by March 6. On March 6, the Union membership, again encouraged by the Union negotiating team, voted to reject the Company's latest proposal. So, the Company implemented its "final offer" of February 20, with the only identified exceptions being the ratification bonuses and the two-percent wage increase. The employees continued to work under the implemented final offer, and the Union announced no plans to strike.
 
 
 12
 On March 12, the Company informed the Union and the employees in writing that if no contract was ratified by March 21, the Company intended "to temporarily replace" all employees working on jobs represented by the Union until an agreement was reached. According to the affidavit testimony of Union negotiator Langham, the Union responded to the Company's planned lockout by again indicating that it had no plans to strike and would work under the implemented final offer pending further negotiations. The Company's final offer for a new collective-bargaining agreement was rejected again by Union negotiators on March 18; and the lockout began on March 21, when Company security guards escorted more than 1,000 employees out of the mill.
 
 
 13
 The grievances at issue in this lawsuit were filed on May 5 and claimed under the 1983-86 Agreement that the Company owed the laid-off employees severance pay for removing them from their jobs in the March 21 lockout. Nothing in the grievance and arbitration procedure outlined in the expired Agreement limits the kinds of disputes subject to arbitration. The Company responded by denying the severance pay grievances and stating that "this issue is not arbitrable due to the expiration of the Labor Agreement."
 
 
 14
 The Union brought this action, claiming that the Company had a contractual duty to arbitrate the severance pay dispute, despite the fact that the lockout occurred after the 1983-86 Agreement had expired. The Union has offered two alternative theories to support this contention: (1) the Company's obligation to arbitrate under the 1983-86 Agreement survived its expiration,[2] and (2) the Company bound itself to arbitrate all disputes by unilaterally implementing its final offer. The district court granted the Union's motion for summary judgment on this second theory, ordering arbitration because a contractual relationship was created by the Union's acceptance of the Company's implemented offer.
 
 II. Implied, Interim Contract
 
 15
 The Company attacks on several grounds the district court's decision that the Company's unilateral implementation of its final offer, and the Union's subsequent commitment to continue working and not strike without a ten-day notice, created an implied, interim contract that included an obligation to arbitrate grievances. First, the Company argues that the unilateral implementation of its final offer did not amount to an "offer" open to the Union's acceptance. Second, the Company contends that even if the implementation created an offer, the Union rejected that offer by three times voting against accepting it. Third, the Company says that even if a contract was created by the implementation of its final offer and the employees' continued performance, any implied contract is between the Company and the individual employees, not between "an employer and a labor organization," as required by section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. Sec. 185(a)) to create the federal court jurisdiction necessary to order arbitration.
 
 
 16
 In reviewing the district court's decision, we are mindful that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). At the same time, courts have liberally construed traditional contract law in this area because of the strong congressional policy favoring arbitrability. See John Wiley & Sons v. Livingston, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898, 904 (1964); Eastern Air Lines v. Air Line Pilots Ass'n, 861 F.2d 1546, 1550 (11th Cir.1988). Moreover, all that is required to find the existence of a collective-bargaining agreement is conduct by the parties manifesting an intention to be bound. See Eastern Air Lines, 861 F.2d at 1550.
 
 A. The Offer
 
 17
 The Company contends that its decision to implement unilaterally was no "offer" for interim employment. The core of the Company's argument is that its March 12 letter to the Union and the employees made clear the Company's position that it was unacceptable for employees to work without a signed labor agreement. As a result, the Company claims, the "final offer" was intended only as an offer for a three-year collective-bargaining agreement. The March 12 letter from the Company said that the Company planned a lockout because "we can no longer continue operating the mill with the uncertainty of not having a signed labor contract, and the possibility of the unions calling a strike at a time best suited to their interests. Operating in this fashion is very difficult and potentially very costly."
 
 
 18
 As an initial matter, the Company letter is dated March 12, six days after the Company implemented its final offer and several weeks after it first announced its intention to implement the offer. The purpose of the March 12 letter was to explain the Company's decision to start a lockout a week later. Considered in context, the March 12 letter only illustrates the Company's unwillingness to continue the interim relationship created by the Company when it implemented its final offer and serves as an explanation for its decision to institute the lockout unless a long-term agreement was ratified.
 
 
 19
 We reject as well the Company's contention that "the undisputed facts are that the terms of the offer were for the express and single purpose of a new three-year collective-bargaining agreement, and for no other purpose." Brief for Defendant at 32. The Company is confusing different kinds of offers. The Company's February 20 offer for a new three-year labor agreement is not the offer upon which the district court predicated its finding of an interim contract. Rather, it was the February 20 offer as implemented on March 6. That these two offers are distinct is without question. For example, the latter offer for interim employment did not include the two-percent wage increases or ratification bonuses included in the February 20 offer.
 
 
 20
 While the Company contends that "[t]here is nothing which provides the least factual foundation for any conclusion that any offer was made to have the employees continue working without a contract or on any interim basis," we read the record as providing no alternative explanations for the Company's conduct.[3] The Company nowhere adequately characterizes an alternative explanation of the legal significance of its decision to implement unilaterally the modified final offer. By implementing that modified offer, the Company was in effect stating the conditions of employment under which the Union's members would work, should they choose to do so, until a long-term agreement was reached.
 
 
 21
 We also reject any contention that the modified final offer implemented by the Company contained no obligation to arbitrate grievances. Though the Company has suggested that such an obligation might not have been included because arbitration was not mentioned specifically in the "final offer" itself, the longstanding negotiation practice makes clear that only proposed changes and disputed items needed to be mentioned specifically because undisputed items carried over automatically. The Company has acknowledged that, assuming the Company "had made an offer to induce the Union employees to continue working without a signed contract[,] ... then the Unions could argue the offer impliedly included all terms and conditions of employment which were not in dispute." Reply Brief for Defendant at 18.
 
 
 22
 It is not the case here, as it was in several of the cases relied on by the Company,[4] that the employer's implemented offer expressly included only portions of its final offer and the union now seeks to bind the employer to other portions of the final offer not expressly included in the implemented offer. The Company here announced that it intended to implement all portions of its final offer, with only two exceptions unrelated to arbitration: the two-percent per-hour wage increases and the ratification bonuses, both of which were included in the February 20 offer but which were excluded from the implemented offer. The Union here does not seek to enforce these excluded portions; instead, the Union is attempting to bind the employer to portions of the final offer that were included expressly or by clear implication in the Company's implemented offer.
 
 
 23
 Though the issue is not directly before us, it is noteworthy that the Company seemingly could have excluded arbitration from the implemented final offer, just as it did the wage increase and ratification bonus.[5] Because the Company made no effort to exclude the obligation to arbitrate as it had with other provisions, the Company cannot successfully complain that the final offer included only the specific items listed.
 
 B. The Acceptance
 
 24
 The Company argues that the period in question, after the parties had reached a bargaining impasse, was one of "confrontation, not contract," and in support of this contention points out that the Union or its membership rejected the Company's February 20 offer on three different occasions. Also, the Union leadership repeatedly characterized the offer as "unfair" in its communications with the membership. As a result, the Company claims, it is contrary to the evidence to interpret the Union's behavior as accepting any offer from the Company.
 
 
 25
 Again, the Company confuses its February 20 offer for a new, three-year bargaining agreement, with the modified offer for interim employment unilaterally imposed by the Company on March 6. The Union or its membership rejected three different times the February 20 offer for a new, three-year bargaining agreement and characterized the February 20 offer as unfair. This conclusion by no means precludes the district court's finding, however. When the Company decided to implement unilaterally a modified version of its final offer, the Union and the Union-represented employees were still faced with the decision of whether to accept the offer of interim employment and to continue working or to strike. We have no conceptual difficulty in understanding that an employment arrangement that was unacceptable as a permanent, formal agreement might still be acceptable as a temporary, stop-gap measure.
 
 
 26
 We conclude that the uncontroverted evidence in the record establishes acceptance of the Company's offer of interim employment. On this score, the uncontradicted[6] affidavit of Union negotiator Langham says that on the first occasion the Company announced its intention to implement the modified February 20 offer, the Union negotiators stated that the Union-represented employees would continue to work on an interim basis and that no strike would be called without a ten-day notice. During the entire period of interim employment, from March 6 to March 17 (when the lockout was imposed), the Union-represented employees continued to work; and the Union never called for a work stoppage. The conduct of the Union and Union-represented employees was sufficient to manifest acceptance of the unilaterally imposed terms of employment. See generally NLRB v. Haberman Construction Co., 641 F.2d 351, 356 (5th Cir.1981) (conduct manifesting intention to be bound is enough).
 
 
 27
 The Company offers some legal authority supporting its position that the Union's conduct did not manifest an acceptance of the interim offer of employment; most closely on point factually are United Food & Commercial Workers Int'l Union v. Gold Star Sausage Co., 897 F.2d 1022 (10th Cir.1990); and Milwaukee Typographical Union v. Madison Newspapers, 444 F.Supp. 1223 (W.D.Wis.1978), aff'd without opinion, 622 F.2d 590 (7th Cir.1980). But both cases are distinguishable.
 
 
 28
 In Gold Star, the Tenth Circuit rejected an argument by a union that certain employee grievances were arbitrable under the terms of the employer's unilaterally implemented final offer, finding that the court lacked jurisdiction to hear the claim because "the Company's last offer is not a contract between the parties." Gold Star, 897 F.2d at 1026. The Gold Star court made clear, however, that "the Union does not even allege that the Company's last offer is, in some sense, a contract between the parties, much less point to any facts in the record that might support such an assertion." Id. The Union here has not only alleged that the evidence illustrates a binding contract; but, as detailed above, the Union pointed to uncontroverted evidence to support its assertion.
 
 
 29
 The Gold Star court did consider it relevant, however, that "[t]he stipulated facts show that the Union has never agreed, even tentatively, to the major provisions of the Company's last offer." Id.; see also International Union v. Big Horn Coal Co., 916 F.2d 1499, 1501-1502 (10th Cir.1990). In a similar way, the district court in Milwaukee Typographical attaches importance to the union's rejection of the substance of the implemented offer, when it was submitted to the union not as an offer of interim employment, but as an offer for a new, long-term agreement. See Milwaukee Typographical, 444 F.Supp. at 1227.
 
 
 30
 To the extent that these opinions suggest that a union's response to a proposal for a formal, long-term agreement can be borrowed out of context to demonstrate the union's rejection of a similar offer for interim employment, we disagree with this approach. More important, the unions pressing for arbitration in these other cases had neither alleged nor shown the same facts that are presented in this case to support the union's acceptance of the offer for interim employment. Along these lines, the Tenth Circuit opinions can be cited for the proposition that such additional evidence of union acceptance does establish an interim contract created by an implemented final offer:
 
 
 31
 Employer implementation of a last and final offer is, by itself, insufficient to invoke jurisdiction absent some manifestation of acceptance of the offer sufficient to create a contract .... The contract between the parties required for jurisdiction need not be a written, signed collective-bargaining agreement, but may exist as any informal agreement between the parties significant to the maintenance of labor peace between them. It suffices that the parties' intent to abide by the agreed-upon provisions of any such informal agreement is in some manner manifest.
 
 
 32
 Big Horn, at 1501-1502 (emphasis added) (citing Gold Star, 897 F.2d at 1026; United Paperworkers v. Wells Badger Industries, 835 F.2d 701, 704 (7th Cir.1987)).
 
 
 33
 In Taft Broadcasting Co. v. NLRB, 441 F.2d 1382 (8th Cir.1971), the Eighth Circuit addressed the legal significance of an employer's letter to Union-represented employees outlining the employer's planned unilateral implementation of its final offer after a bargaining impasse. The Taft court suggested that no conduct is required by the union or the employees it represents to bind the employer to its final offer as "an interim agreement to arbitrate unresolved grievances." Id. at 1385. The court noted that,
 
 
 34
 In this context the letter can properly be regarded as offering, at the same time, to continue, at least for a while, certain practices. While in one breath Taft asserts that the letter could not ripen into a contract unless the union formally accepted it, in the next it says, quite correctly, that '[t]he letter calls for no response on the union's part, either by action or by reply.' ... [W]e conclude that the Board could properly find that the union's inaction was, contractually, just what was called for.
 
 
 35
 Id.
 
 
 36
 The Seventh Circuit, in United Paperworkers v. Wells Badger Industries, 835 F.2d 701 (7th Cir.1987), also held that an employer was bound to the terms of its unilaterally implemented final offer, including the obligation to arbitrate grievances arising after the expiration of the previous bargaining agreement. Though the employer in Wells Badger had offered more specific assurances about grievance resolution than International Paper had here, we think it is equally justified to conclude that "[t]he assurance of the company and the reliance thereupon by the employees is certainly sufficient under the facts and the circumstances of this case upon which to determine objectively the intentions of the parties." Id. at 704.
 
 C. Section 301 Jurisdiction
 
 37
 The Company contends that the evidence fails to establish a "contract[ ] between an employer and a labor organization" as required by section 301 of the LMRA to establish federal court jurisdiction of the dispute over arbitrability. To exercise federal court jurisdiction under section 301, we must find (1) a claim for violations of (2) a contract (3) between an employer and a labor organization. Carpenters Local Union v. Pratt-Farnsworth, 690 F.2d 489, 500 (5th Cir.1983); see also Johnson v. Pullman, 845 F.2d 911, 914 (11th Cir.1988) ("A federal court has jurisdiction over a suit for violation of a collective-bargaining agreement under section 301 only while the agreement is in force.").
 
 
 38
 The first element, a claim for violations, is satisfied by our holding that the obligation to arbitrate was included in the unilaterally implemented offer. The second element, the existence of a contract, is satisfied by our conclusion that there was a Company offer of interim employment and acceptance of that offer. See Smith v. Kerrville Bus Co., 709 F.2d 914, 920 (5th Cir.1983) (Section 301 "must be broadly construed to encompass any agreement, written or unwritten, formal or informal, which functions to preserve harmonious relations between labor and management."). The Company says, however, that any agreement reached was between the Company and its individual employees, not with the Union itself. As a result, the Company contends, there is no contract between an employer and labor organization as required by section 301.
 
 
 39
 In support of its claim that any interim contract was between the Company and individual employees, the Company cites International Union v. Atlas Tack Corp., 590 F.2d 384 (1st Cir.1979). In that case, the union argued that the employer's unilateral imposition of portions of its final offer bound the employer to all the terms of its final offer. The First Circuit held that it lacked jurisdiction under section 301 because, "[e]ven assuming this unilateral contract theory were applicable in the labor relations context at all, it would give rise to individual contracts between [the employer] and the employees, not a collective contract between [the employer] and the Union." Id. at 386. We find that case distinguishable because the court's conclusion hinged on the fact that "[t]he Union does not claim that it accepted the offer, but rather that the employees accepted it by their performance as individuals." Id.[7]
 
 
 40
 Of course, the Union here has not only claimed that the Union accepted the Company's offer of interim employment, but the Union has proffered uncontradicted evidence to buttress that claim. The uncontroverted evidence shows the Union expressly agreed that the employees it represents would continue working under the Company's unilaterally implemented offer and that the Union would not call a strike without a ten-day notice. In the circumstances of this case, when the Union agreed to give up portions of its usual arsenal of economic weapons and the Union-represented employees continued working in reliance of the terms of the Company's implemented offer, there is, as a matter of law, enough to manifest the Union's intention to be bound by the temporary agreement. See Big Horn, at 1501-1502 (implied, interim contract resulting from implemented final offer may take form of "informal agreement between the parties significant to the maintenance of labor peace between them").
 
 III.
 
 41
 We affirm the district court's conclusion that the federal courts have jurisdiction under section 301 to hear this dispute over the arbitrability of the severance pay grievances. Because we find that the arbitration clause was included in the Company's implemented offer, we further affirm the district court's grant of summary judgment for the Union on the issue of arbitrability under the interim contractual relationship.
 
 
 42
 Nothing in our opinion today should be read to hold that whenever an employer implements its final offer upon a bargaining impasse, the employer is bound to arbitrate disputes arising during the interim. Instead, we hold that where, as here, (1) the employer has made no effort to exclude its preexisting obligation to arbitrate from the implemented offer, (2) that offer can fairly be read to include an obligation to arbitrate, and (3) the conduct of the union manifests its intent to be bound by the terms of that interim offer, a binding, interim contract is created; and the federal courts have competent jurisdiction to order arbitration of disputes arising during the interim relationship. We express no view on the question of whether the Company owes its employees severance pay; that is for the arbitrators to decide. See United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (in arbitrability cases, issue of "whether the moving party is right or wrong is a question of contract interpretation for the arbitrator").
 
 
 43
 AFFIRMED.
 
 
 
 *
 Honorable Edward D. Re, Chief Judge of the U.S. Court of International Trade, sitting by designation
 
 
 [1]
 We treat as one for discussion purposes the United Paperworkers International Union and Local Unions 265, 337, 1940 and 2650
 
 
 [2]
 The district court granted the Company's motion for summary judgment on this theory. Because we conclude that the parties must arbitrate under the terms of a binding, interim contract created after expiration of the 1983-86 Agreement, we need not consider whether the obligation to arbitrate survived the expiration of the 1983-86 Agreement. See Paperworkers v. Wells Badger Industries, 835 F.2d 701, 705 (7th Cir.1987) (holding that once court finds obligation to arbitrate in interim employer-union relationship, there is no need to address obligation to arbitrate under expired agreement)
 In addition, we reject as meritless the Union's contention that the issue of arbitrability itself should be submitted to an arbitrator. "[T]he question of arbitrability--whether a collective-bargaining agreement creates a duty for parties to arbitrate the particular grievance--is undeniably an issue for judicial determination." AT & T Technologies v. Communications Workers, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986).
 
 
 [3]
 We note with approval further factual findings by the district court supporting its conclusion that the Company intended to be bound by the terms of its implemented offer. The district court found that the Company continued to honor all other portions of its implemented offer and only rejected its obligation to arbitrate after the Union demanded arbitration of the severance pay grievances. See NLRB v. Haberman Construction Co., 641 F.2d 351, 356 (5th Cir.1981) (holding that the employer "manifested an intent to abide by the ... contract [ ] by enjoying its benefits and abiding by its provisions"). Further, the district court found that "[t]he Company had promised and continued to withhold union members' dues for the Unions," as required by the terms of the implemented final offer; this act on the Company's part acknowledged an obligation to the Union under this interim agreement. See Part II-C of this opinion
 
 
 [4]
 See, e.g., Milwaukee Typographical Union v. Madison Newspapers, 444 F.Supp. 1223 (W.D.Wis.1978), aff'd without opinion, 622 F.2d 590 (7th Cir.1980); International Union v. Atlas Tack Corp., 590 F.2d 384 (1st Cir.1979)
 
 
 [5]
 The law is clear that "if the parties were indeed at an impasse, then the employer's statutory duty to maintain the status quo during post contract negotiations would end." Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 548 n. 5, 108 S.Ct. 830, 838 n. 5, 98 L.Ed.2d 936 (1988); see also 29 U.S.C. Sec. 158(d) ("[The] obligation [to bargain collectively] does not compel either party to agree to a proposal or require the making of a concession.")
 In addition, the obligation to arbitrate, as solely a "creature of contract," has been exempted from the rule announced in NLRB v. Katz, 369 U.S. 736, 744-46, 82 S.Ct. 1107, 1112-13, 8 L.Ed.2d 230 (1962), that when impasse occurs, the employer is free to implement changes in employment terms unilaterally only so long as the changes have been previously offered to the Union during bargaining.
 To conclude otherwise flies in the face of the specific admonition of Congress that submission to arbitration is purely a matter of consent and cannot be mandated by operation of the [LMRA]. Rather, we find, because an agreement to arbitrate is a product of the parties' mutual consent to relinquish economic weapons such as strikes or lockouts, otherwise available under the [LMRA] to resolve disputes, that the duty to arbitrate is sui generis. It cannot be compared to the terms and conditions of employment routinely perpetuated by the constraints of Katz.
 Indiana & Michigan Electric Co., 284 NLRB No. 7 (1987).
 
 
 [6]
 Though the Company attempts to discredit Langham's affidavits by pointing out some factual discrepancies (most of which were corrected by Langham himself in subsequent affidavits), the Company nowhere challenges the substance of Langham's testimony and, given the opportunity to do so in oral argument, again did not
 
 
 [7]
 We accept that under some circumstances a unilaterally implemented final offer from an employer and later performance by the employees could create only individual contracts. See J.I. Case Co. v. NLRB, 321 U.S. 332, 337, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944). For example, if the Union had called for a strike, those workers that continued to work seemingly would then have individual contracts with the Company. But, we have concluded that the conduct of the Union in this case was sufficient to demonstrate the Union's intent to be bound by the interim agreement. The Union for decades had been the exclusive bargaining agent with the Company for the employees; and nothing in this case shows that, before the lockout, the Union and the employees it represented had parted ways on any question. We decline to presume that the unity between the Union and Union members had been shattered (so that the Union did not speak for the workers and the workers did not act pursuant to the Union's direction) in the absence of evidence to that effect. Cf. NLRB v. Curtin Matheson Scientific, Inc., --- U.S. ----, 110 S.Ct. 1542, 1544-45, 108 L.Ed.2d 801 (1990) (holding that even in times of significant labor-management strife, union enjoys continuing "presumption of majority support" rebuttable only "by showing that ... (1) the union did not in fact enjoy majority support, or (2) the employer had a 'good faith' doubt, founded on a sufficient objective basis, of the union's majority support.") (emphasis in original) (citations omitted); Bickerstaff Clay Products Co. v. NLRB, 871 F.2d 980, 984 (11th Cir.1989) (holding that union certified as exclusive bargaining agent "is entitled to a continuing presumption of majority status"); Hajoca Corp. v. NLRB, 872 F.2d 1169, 1173 (3d Cir.1989) (holding that "the presumption of majority status survives the expiration of a collective bargaining agreement"). See generally Humble Oil & Refining Co. v. Sun Oil Co., 191 F.2d 705, 715 (5th Cir.1951) ("A fact, once shown to exist, is presumed to continue until the contrary is proven.")