[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10768

Non-Argument Calendar

_____

TK GLOBAL, LLC,

Petitioner-Cross Respondent,

*versus*

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner,

PLUMBERS AND PIPEFITTERS LOCAL 72,

Intervenor.

_____

Petitions for Review of a Decision of the
National Labor Relations Board
Agency No. 10-CA-267762

_____

Before BRANCH, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

In this labor law case, the National Labor Relations Board ("NLRB" or "the Board") found that TK Global, LLC ("TK" or "the Company"), violated several provisions of the National Labor Relations Act ("NLRA") by prematurely terminating a project labor agreement ("PLA") and then firing and refusing to hire union workers. The core dispute is whether TK was bound by the PLA to the terms of a collective bargaining agreement ("CBA") requiring participating employers to hire exclusively union workers. An administrative law judge ("ALJ") found that TK was bound by the PLA, and the Board agreed. TK now petitions this Court for review of the Board's decision, arguing that (1) it never expressly agreed or otherwise manifested an intent to be bound by the CBA, and (2) its decision to step away from union workers was neither motivated by animus nor inherently destructive of employee rights. The Board filed a cross-application for enforcement of its order. After review, we conclude that the Board's decision is supported by substantial evidence. Accordingly, we grant the Board's application for enforcement and we deny T.K.'s petition for review.

## I.    Background

### A. Factual Background

#### i. The Parties and the CBA

TK is a pipefitting fabrication and installation company owned by Tae Kyong Kim and managed by Phillip Ahn, both of whom emigrated to the United States from South Korea. One of Ahn's principal duties is to translate and communicate for Kim, who does not speak English.

The Union in this case is the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO. The Union has a type of CBA with the Mechanical Contractors Association of Georgia known as an "area agreement." This CBA applies to all members of the Mechanical Contractors Association and any employers that separately enter into an agreement to be bound by the CBA. The Union and the NLRB contend that TK entered into such a separate agreement here.

The two key provisions of the CBA, for purposes of this case, describe the referral and hiring process for covered employers. The first is a non-discrimination provision: it gives the employer "the right to determine the competency and qualifications of employees . . . referred by the Union," as well as "the right to hire and discharge accordingly," provided that "such rights shall be exercised on a non-discriminatory basis" and "shall not be based on, or be in any way affected by . . . union membership . . . or any

other aspect or obligation of union membership[.]" The next is sometimes called an "exclusivity" provision: it states that the Union will furnish the employer with duly qualified workers in sufficient numbers to properly do the contracted work—and, if it does not, "the employer may secure" labor "from other sources."

### ii.  The Negotiation and Signing of the PLA

TK was hired to perform pipefitting work on the construction of a manufacturing facility in Commerce, Georgia.

In March of 2020, a Union representative approached TK, asking if the company needed additional workers for the construction project. TK did not initially hire any Union workers because it already had several employees working on the project, most of whom were Korean.

When the company later needed more workers, a Union organizer, David Cagle, met with Ahn. Cagle told Ahn that the company had to sign an agreement before the Union would provide workers.[1] Cagle did not have a copy of the CBA with him, so he described it in general terms, including the provisions covering the referral and hiring of employees. In particular, he explained that the company had the right to reject or terminate any

---

[1] On this point, the ALJ credited Cagle's testimony that he told Ahn the company needed to sign an "agreement" over Ahn's testimony that the company would need to sign a "document." Because that conclusion is not "inherently unreasonable" or "self contradictory," we are bound by it. *NLRB v. Allied Med. Transp., Inc.*, 805 F.3d 1000, 1005 (11th Cir. 2015) (quotation omitted).

23-10768                Opinion of the Court                5

workers referred by the Union, but that employers were asked to first notify the Union of any issues.

The next day, Cagle e-mailed Ahn. "The subject line of the email read 'CBA for PLA.'" A copy of the CBA was attached to the e-mail.

Ahn texted Cagle acknowledging receipt of the e-mail and attachment. Ahn asked Cagle to confirm that, if TK decided to hire Union workers, those workers would still need to fill out a job application and could be terminated at-will.[2]

The day after that, Cagle e-mailed Ahn a copy of a one-page PLA. The PLA reads as follows:

> Project Labor Agreement for UA Local Union 72 & TK LLC at the SKI Battery Plant, Commerce Georgia and TK LLC Pipe Fabrication Shop located at 274 Galilee Church Road, Jefferson, Georgia 30549
>
> The agreement is a Collective Bargaining Agreement/Project Labor Agreement for the above listed jobsites/projects. The duration of this agreement will be in effect until the end of the above listed jobsites/projects.

---

[2] The ALJ credited Cagle's recollection that Ahn only ever asked about the ability to *fire* workers over Ahn's testimony that he wanted to confirm that TK could hire whoever it wanted and terminate them for any reason. *See Allied Med. Transp.*, 805 F.3d at 1005.

Ahn e-mailed Kim a copy of the CBA and the PLA and asked him to sign the PLA and return it.  Ahn informed Kim that he had read over the "62 pages of documents as well," referring to the CBA, but that he did "not have the profession [sic] on this field." Ahn said that he believed the CBA was "what they [are] required to give us such as [a] CC&R," apparently referring to the "covenants, conditions, and restrictions report" that a seller is required to provide to a buyer in a real estate transaction.  Kim later signed and returned the PLA.  Ahn and Cagle executed the PLA.

> iii.   *TK requests worker referrals, hires and fires workers, and pays wages and benefits consistent with the CBA.*

The day after they executed the PLA, however, Ahn e-mailed Cagle and told him that TK no longer needed workers for the construction project because of scheduling issues.   Ahn apologized and said he would contact Cagle if the company planned to hire in the future.  Ahn also stated that they should void out the agreement and make a new one when the company was ready to hire.  Cagle did not respond or agree to void the contract.

A few weeks later, Ahn contacted Cagle again and asked for five workers.  There was no discussion about a new agreement. The Union supplied the workers, and they worked for TK for about six weeks.

During that time, TK paid the union workers wages and fringe benefits consistent with the terms of the CBA.  Indeed, when TK's payroll department was confused about how and where to

make fringe benefit contributions, Ahn asked Union fund administrators for assistance. Along the same lines, when one of the workers had worked a Saturday but had not been paid for overtime hours, Cagle and Ahn discussed over e-mail how overtime and "make-up time" (a shorthand for off schedule work done to replace hours missed because of unforeseen circumstances) played out under the CBA. Ahn specifically quoted the relevant provision of the CBA and explained that he wanted to make sure he understood how to interpret this language because he wanted to avoid further misunderstandings.

TK terminated the five workers sometime later, because, according to Ahn, they could not communicate effectively with Korean workers already on the job site and the supervisor was not satisfied with their work. Ahn notified Cagle by e-mailing him that the company had exercised its right to terminate workers at-will and that he hoped they could work together again in the future. The Union was unhappy with TK firing the five employees because TK "had [non-union] people working on" projects covered by the CBA, but the Union "let it go because of the bigger picture . . . instead of blowing it all up[.]" In particular, Ahn and Cagle had discussed replacing those existing employees with Union employees over time.

Over the next few weeks, Ahn requested and hired several more workers. TK paid wages and deducted Union dues for all of them consistent with the CBA.

> iv. *TK seeks out a subcontractor to complete the project and terminates the PLA after the Union insists on exclusive hiring.*

Eventually, however, TK realized it might not complete the project on schedule. Ahn reached out to the Union, asking if the Union might be able to take over work on the project as a subcontractor. The Union said it could not, the most it could do was provide laborers. So TK hired a subcontractor, Genesys Systems Integration, to provide labor and management to finish the project.

When the Union found out that TK had hired a subcontractor to complete the project, it went to Ahn with the Union lawyer and explained that the CBA required TK to hire exclusively through the Union for the project. Ahn said he had never agreed to an exclusivity provision and TK would never have agreed had it known that the agreement required exclusivity. Still, TK was happy with the union workers it had at that point, and the company arranged to hire 13 more.

At some point after this meeting, Ahn spoke with Tim Fackler, the Sales Manager of the subcontractor, Genesys Systems Integration. Fackler advised Ahn to withdraw from or terminate the agreement, and he helped Ahn draft a letter to that end. The letter stated that TK did not believe that the agreement was "representative of [the parties'] collaborative discussions prior to issuing or execution of the agreement," and therefore "request[ed]

immediate withdraw[al] and termination without penalty of any and all obligations contained" in the PLA and CBA.

> v. *TK terminates the agreement and separates from union employees because it no longer had a contract with the union.*

After that, Ahn and Kim arranged to meet with the Union workers still on site. They told the foreman that they had to discharge him and his crew because they no longer had any agreement with the Union. TK also declined to hire any of the 13 Union members that it had solicited at the last meeting with the Union.

### B. *Procedural Background*

After an investigation, the General Counsel of the NLRB charged TK with violating the NLRA by terminating the agreement, and refusing to hire union workers. *See* 29 U.S.C. § 158(a)(1), (3), (5).[3] The ALJ found for the NLRB, as follows.

---

[3] Sections 8(a)(1), (3), and (5) fully provide as follows:

**(a) Unfair labor practices by employer**

It shall be an unfair labor practice for an employer--

> (1)  to interfere with, restrain, or coerce employees in the ex-ercise of the rights guaranteed in section 157 of this title;
>
> . . .
>
> (3)  by discrimination in regard to hire or tenure of employ-ment or any term or condition of employment to

10                Opinion of the Court                23-10768

encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

. . .

(5)  to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

First, the ALJ concluded that TK violated Sections 8(a)(5) and 8(a)(1) of the NLRA when it withdrew from the PLA. To begin, the ALJ found that TK's "execution of the PLA bound it to the CBA" because the PLA's reference to "'a Collective Bargaining Agreement/Project Labor Agreement'" was sufficient to show that the CBA and PLA were "a single, combined agreement objectively reflect[ing] the parties' intent to incorporate the CBA into the PLA." "This conclusion [was] further bolstered," the ALJ said, "by the circumstances surrounding the parties' execution of the PLA."

But even if signing the PLA did not expressly bind TK to the CBA, the ALJ concluded that TK was also bound to the CBA by conduct. The ALJ found that, from the time that the parties executed the PLA to TK's announcement that it was withdrawing from the agreement, TK hired all its employees for the construction project through the Union's referral service; paid wages and fringe benefits in accordance with the CBA; made benefit fund contribution payments deducted and remitted Union dues; referenced the CBA in an overtime dispute; and asked Cagle for clarification as to the correct interpretation of the language in the CBA.

Second, the ALJ concluded that firing and refusing to hire Union employees after terminating the agreement violated § 8(a)(5) and (a)(1) of the NLRA because TK "failed to honor the non-

---

29 U.S.C. § 158(a)(1), (3), (5).

discrimination provision" of the CBA "without bargaining with the Union[.]"

And third, the ALJ concluded that firing and refusing to hire those same Union employees after terminating the agreement violated § 8(a)(5) and (a)(3) because it was "inherently destructive of important employee rights" and "strong evidence of [anti-]union animus." (quotation omitted).

The NLRB (through a delegated panel) summarily affirmed by adopting the ALJ's order.[4] TK filed a petition for judicial review in this Court, and the NLRB cross-petitioned for enforcement of its order. The Union intervened and filed a brief supporting the NLRB.

## II.    **Standard of Review**

We review the Board's legal conclusions *de novo* and its findings of fact for substantial evidence. *Mercedes-Benz U.S. Int'l, Inc. v. Int'l Union, UAW*, 838 F.3d 1128, 1134 (11th Cir. 2016). "We will enforce an order of the Board if its factual findings are supported by substantial evidence on the record considered as a whole." *Allied Med. Transp.*, 805 F.3d at 1005 (quotation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Northport Health Servs. v. NLRB*, 961 F.2d 1547, 1550 (11th Cir. 1992) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S.

---

[4] The panel amended the remedial order and corrected certain omissions in that section; those changes are not at issue here.

474, 477 (1951)).    We are bound by an ALJ's credibility determinations unless "they are inherently unreasonable, self-contradictory, or based on an inadequate reason." *Allied Med. Transp.*, 805 F.3d at 1005 (quotation omitted); *see also NLRB v. Dynatron/Bondo Corp.*, 176 F.3d 1310, 1313 (11th Cir. 1999) (the Board's findings of fact are "conclusive 'if supported by substantial evidence on the record considered as a whole.'" (quoting 29 U.S.C. § 160(e), (f))).

## III.    Discussion

TK argues that the Board erred in finding it violated the NLRA by withdrawing from the PLA and firing or refusing to hire union workers after doing so and that the Board's findings are not supported by substantial evidence.    For the reasons discussed below, we conclude that substantial evidence supports the Board's findings.

> A.  *Substantial evidence supports the finding that TK violated the NLRA by prematurely terminating the PLA.*

TK first argues that the Board erroneously found violations of § 8(a)(5) and (a)(1) because there is not substantial evidence to show that it agreed to be bound by the PLA or the CBA.

Section 8(a)(5) declares that "[i]t shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees[.]"  29 U.S.C. § 158(a)(5); *see NLRB v. Katz,* 369 U.S. 736, 743 (1962) (elaborating on the duty to bargain collectively). An employer violates the obligation to

14                    Opinion of the Court                    23-10768

collectively bargain with his employees' representative if he "terminate[s]" the CBA without observing the statutory process (TK does not argue that it observed the statutory process). 29 U.S.C. § 158(d). The NLRB argues, and TK does not dispute, that if a violation of Section 8(a)(5) is established, there is also a "derivative" violation of Section 8(a)(1)—which prohibits "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise" of rights under the Act. 29 U.S.C. § 158(a)(1).

TK is not a member of the Mechanical Contractors Association with whom the Union signed the CBA, so whether it is bound by the terms of the CBA depends on whether it entered into (what is known as) a "me too" agreement. *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 142 n.4 (4th Cir. 2019).

> [A] "me-too agreement" . . . is a contract where an employer agrees to be bound by the terms of a CBA negotiated by a multiemployer association and [a] local union. Such agreements permit employers to benefit from the terms of an association's CBA without having to participate in the collective bargaining process.

*Id.* (internal citation omitted)). In evaluating whether TK entered into such an agreement, we are "guided by the general common law of contracts." *E. Air Lines, Inc. v. Air Line Pilots Ass'n*, 861 F.2d 1546, 1550 (11th Cir. 1988). A binding labor agreement, like any contract, typically involves an offer, acceptance, and consideration, but "all that is required to find the existence of a [CBA] is conduct

23-10768          Opinion of the Court          15

by the parties manifesting an intent to be bound." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 920 F.2d 852, 855, 855–59 (11th Cir. 1991).

The only dispute in this appeal is whether the parties reached a "meeting of the minds" on binding one another to the terms of the CBA. *NLRB v. Downs-Clark, Inc.*, 479 F.2d 546, 548 (5th Cir. 1973).[5] This question deals not with the parties' subjective intentions—but rather their intent as objectively manifested in what they said and did. *See New Process Steel, L.P. v. NLRB*, 564 F.3d 840, 851 (7th Cir. 2009) (agreeing with the board that "in federal labor law, as in common law, an agreement is judged by conduct evidencing an agreement rather than a party's subjective belief"), *reversed and remanded on other grounds*, 560 U.S. 674 (2010). TK contends that the PLA furnishes no rights or obligations on its own terms, and that it does not otherwise incorporate the CBA by reference.

Reviewing the record, we conclude that there is substantial evidence for the ALJ's conclusion that, by executing the PLA, the parties intended to enter into a labor agreement under the terms of the CBA. The ALJ found the following facts—none of which TK disputes—demonstrated that TK intended to be bound to the terms of the CBA. Ahn sought Cagle's help on hiring qualified

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit "handed down . . . prior to the close of business" on September 30, 1981).

employees.  Cagle told Ahn that the Union could only supply employees if TK signed an agreement with the Union.  Cagle then explained the general terms of the CBA to Ahn, and, when he sent the CBA to Ahn, the subject line of the e-mail forwarding the CBA to Ahn read "CBA *for PLA*" (emphasis added).  Ahn proceeded to read the CBA, which (by its terms) applies to all employers executing a document agreeing to be bound.  Ahn later forwarded both the CBA and the PLA to Kim for his signature.  After executing the PLA, Ahn's e-mail to Cagle suggested that the parties "void[ ] out *the contract.*" Notably, Cagle did not agree to void out the PLA, and the parties never replaced it with a new agreement before the Union started referring workers, despite Cagle telling Ahn there had to be a signed agreement before the Union would refer workers. When union workers came onboard, TK paid wages and fringe benefits, and deducted union dues, in accordance with the CBA, even quoting the CBA in an e-mail seeking clarification on wage questions.  We agree with the ALJ that these facts demonstrate, by substantial evidence, that TK intended to enter a contract with the Union in accordance with the terms of the CBA. *See E. Air Lines, Inc.*, 861 F.2d at1550 ("[T]he fact that Eastern currently claims wide areas of difference in the interpretation of [ ] important terms is not, of itself, sufficient to support a finding of no contract" because "the outward indicia of agreement point indisputably to a contractual arrangement.").

TK argues that the facts show that it "never intended to enter into any agreement of any kind containing an exclusive hiring . . . requirement[.]"  Instead, TK says, the evidence shows that it

expressed a desire for "complete control over employees." TK argues that even if Cagle misunderstood its intentions, and thought that TK Ahn merely wanted to be able to terminate employees at will, "[t]hese inconsistent understandings . . . show that the parties . . . never reached a meeting of the minds[,]" "especially in light of the obvious and undeniable language-comprehension obstacles[.]" TK's view of the evidence is plausible—but it is not the only way to view the evidence, and the Board's view is adequately supported. *See Int'l Brotherhood of Boilermakers v. NLRB*, 127 F.3d 1300, 1306 (11th Cir. 1997) ("If the Board has made a plausible inference from the evidence, we may not overturn its findings, even if we would have made contrary findings upon a *de novo* review of the evidence.").

TK makes a few other arguments in response, but they all fail. TK insists, for example, that "Kim is the only TK person authorized to bind TK to a contract, and [ ] Kim did not see the CBA before he signed the one-page [PLA]." But there is credible evidence to the contrary. The CBA was attached to Ahn's e-mail soliciting Kim's signature on the PLA, and it was Kim's practice to rely on Ahn's translations to conduct business. So it does not necessarily follow that Kim never gave the requisite assent to the terms of the CBA. The ALJ's conclusion that Kim effectively assented is reasonable. *See id.* (explaining that we may not overturn a reasonable inference from the facts).

TK next points to Ahn's statement, after the subcontractor issue arose, that TK would never agree to an exclusive hiring arrangement. This statement *might* show that Ahn and Kim

fundamentally did not understand the contract—but it is not the only conclusion one could draw from the evidence. The evidence overall is equally consistent with the conclusion (discussed above) that TK's conduct surrounding the execution of the PLA signaled an intent to be bound to the CBA. *See id.* (we may not overturn a reasonable inference from the facts).

Finally, TK points to "the important language-comprehension and cultural differences" between the parties. But once again, the evidence does not demand the conclusion that Ahn and Kim did not understand the nature and relationship of the documents here. *See id.* (we may not overturn a reasonable inference from the facts).

Thus, because the ALJ's findings of fact are "supported by substantial evidence," they are "conclusive," and we agree that TK agreed to be bound to the terms of the CBA. *Dynatron*, 176 F.3d at 1313.

> *B. Substantial evidence supports the finding that TK violated the NLRA by firing and failing to hire union workers after purporting to withdraw from the PLA.*

TK also challenges the Board's finding that it violated § 8(a)(3) by firing and refusing to hire union workers, because of their membership, after purporting to withdraw from the PLA. [6]

---

[6] The ALJ also found that this conduct violated § 8(a)(1) and (a)(5). TK challenges those findings, as well, but it focuses on the § 8(a)(3) violation, and argues that it did not violate § 8(a)(1) or (a)(5) for the same reasons that it contends it did not violate § 8(a)(3). Because TK makes just the one argument,

Section 8(a)(3) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]"  29 U.S.C. § 158(a)(3).  A violation of § 8(a)(3)'s nondiscrimination rule can be shown in two ways.  First, an employer violates § 8(a)(3) if activity protected by the Act was a motivating factor in the discharge.  *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983).  Second, even if no unlawful motive is shown, an employer can violate § 8(a)(3) if the employer's action is "inherently destructive" of employee rights.  *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34 (1967).

"Some conduct . . . is so inherently destructive of employee interests that it may be deemed proscribed without need for proof of an underlying improver motive."  *Great Dane Trailers*, 388 U.S. at 33 (quotation omitted).  "If the conduct in question falls within this inherently destructive category, the employer has the burden of explaining away, justifying or characterizing his actions as something different . . . if he fails, an unfair labor charge is made out."  *Id.* (quotation omitted).  Conduct that "discriminates solely on the basis of union status" is inherently destructive.  *Metro. Edison*, 460 U.S. at 702.

---

and we conclude that substantial evidence supports the ALJ's decision, we need not decide whether TK is right to treat the § 8(a)(1) and (a)(5) violations as derivative.

The ALJ concluded that firing and refusing to hire Union employees after terminating the PLA was "inherently destructive of important employee rights" and "strong evidence of [anti-]union animus" because, "[u]nder the circumstances, these adverse actions . . . were a direct result of [TK's] premature termination/repudiation of the parties' agreement[.]" (quotation omitted). "Furthermore, [TK] . . . failed to present a legitimate and substantial business justification for taking these actions and failed to prove that it would have taken the same actions in the absence of the Union threatening to enforce the exclusivity provision."

TK offers reasons why firing and refusing to hire the Union workers was not "inherently destructive" of employee rights, but, as TK agrees in its reply brief, they all depend on the assertion that TK was not bound to the CBA. And as we have already discussed, substantial evidence supports the conclusion that it was bound to the terms of the CBA.

Thus, because TK has not challenged the substantial evidence found by the ALJ on inherent destructiveness related to the binding PLA, there is no need to go further.

## IV.    Conclusion

In sum, we conclude that substantial evidence supports the NLRB's findings that TK violated the NLRA. We therefore deny the petition for review and grant the Board's cross-petition to enforce its order.

**Petition DENIED and cross-petition for enforcement GRANTED.**