BOBBIE BROOKS, INC.,
Plaintiff-Appellant,

v.

INTERNATIONAL LADIES' GARMENT
WORKERS UNION,
Defendant-Appellee.

No. 86–3896.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 6, 1987.

Decided Dec. 29, 1987.

Robert T. Rosenfeld (argued), Mary G. Balaza, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for plaintiff-appellant.

Melvin S. Schwarzwald (argued), David M. Fusco, Schwarzwald, Robiner, Wolf & Rock, Cleveland, Ohio, Max Zimny, New York City, for defendant-appellee.

Before LIVELY, Chief Judge, KEITH and MILBURN, Circuit Judges.

KEITH, Circuit Judge.

Bobbie Brooks, Inc. ("Company") brought this action in the Cuyahoga County Court of Common Pleas on June 27, 1986, seeking a declaratory judgment that no collective bargaining agreement existed between it and the International Ladies Garment Workers' Union ("Union"), and that it should not be required to arbitrate a grievance initiated by the Union concerning severance pay allegedly owed to employees of the Company. On July 9, 1986, the Union removed the action to the United States District Court for the Northern District of Ohio, Eastern Division, and counterclaimed against the Company, requesting a declaratory judgment that a collective bargaining agreement did exist, and seeking an order compelling arbitration.

On August 29, 1986, the district court issued a memorandum and order declaring that a collective bargaining agreement existed between the parties and ordering the parties to proceed to arbitration.[1] For the reasons set forth below, we AFFIRM the judgment of the Honorable Ann Aldrich, United States District Court for the Northern District of Ohio.

I.

The Company is a manufacturer of women's apparel in the "junior" clothing market. At one time, the Company had numerous facilities throughout the United States and employed as many as 6,000 workers. During its best years, the Company's sales reached $200 million. During the 1970's, the Company experienced difficult financial times and in 1982, it filed for bankruptcy under Chapter 11. By 1985, the number of production and distribution facilities within the Company still under union contract had dwindled to three: sewing plants in Coosa River, Alabama and Ballaire, Ohio; and a distribution center in Cleveland, Ohio.

The Union has represented the Company's factory and distribution center employees since 1939. Since 1961, the collective bargaining agreements between the Union and the Company have consisted of a Master Agreement, Supplemental Agreements containing terms applicable to individual plants, and side letter agreements modifying the Master Agreement.

Restrictions on non-union production by the Company have consistently been included in the agreements between the parties. In their 1982–1985 agreement, these restrictions were contained in Article thirty-three of the Master Agreement. Article thirty-three limited domestic production by non-union workers, as well as imports of goods produced or partially produced abroad. Penalties for violation of the non-union production provisions were contained in Article thirty-five of the 1982–1985 Master Agreement, which provided for liquidated damages. Also, paragraph five of Article thirty-three provided for damages of one and one-half percent of the first cost of imported goods exceeding twelve and one-half percent of the Company's total annual sales volume.

These provisions of the 1982–1985 agreement, however, were modified by a side letter agreement dated November 29, 1983, and October 1, 1986.

---

1. An arbitration hearing was held before Arbitrator Charles F. Ipavec on September 30, 1986

effective during the 1983, 1984 and 1985 calendar years. This side letter agreement exempted certain types of garments from Article thirty-three, set numerical goals for production in Company facilities and created formulae for liquidated damages which substantially reduced the amount of liquidated damages specified in the Master Agreement.[2]

The 1982 collective bargaining agreement between the parties terminated on June 30, 1985. Negotiations for a new contract began in early June, 1985 in New York.[3] The Union proposed that restrictions on the side letter not be renewed and that non-union production be prohibited entirely. The Company proposed that the restrictions on non-union production be stricken entirely to permit it complete freedom in choosing its sources of production. Despite these conflicting proposals, none of the union representatives admitted to having authority to discuss non-union production. Both original proposals, therefore, were abandoned early in the negotiations.

On July 10, 1985, Robert Rosenfeld, the chief Company negotiator, met privately with Joseph Good, associate general counsel for the Union, to discuss contract language in preparation for a meeting of the negotiating teams later in the month. They negotiated the issue of replacing the contract arbitrator, agreeing that a single arbitrator would be employed. They also discussed the last sentence of paragraph 1(k) of Article thirty-three, which restricted the Company's ability to move work between plants. Rosenfeld expressed the Company's interest in removing this arrangement from the new Master Agreement. The Union's *quid pro quo* for deleting this arrangement was a severance pay provision. Rosenfeld did not repeat the Company's original proposal to eliminate the restrictions on non-union production.

The Union's proposal to eliminate the side letter was not raised.

The negotiators met again in Cleveland on July 17th and 18th. The non-union production issue was discussed; however, it was tabled because the Union negotiators stated that they had no authority to discuss it. Several other issues remained to be resolved on July 17th. Those issues were: 1) package of wage and fringe benefits; 2) severance pay; 3) the Company's concern that Union workers would honor picket lines by employees of Pubco, Inc. ("Pubco")[4] at the Cleveland distribution center; 4) the person to be designated as the arbitrator; and 5) the non-union production issue. On July 18th, the negotiators worked out the economic issues; they congratulated each other and reduced these terms to writing in a handwritten "Memorandum of Agreement" which was signed by both sides. The parties also agreed that the Pubco issues would be resolved in the Company's favor; the terms of this agreement were contained in a side letter to the Master Agreement.

The parties understood the Memorandum of Agreement to extend the 1982–85 agreement because management-labor activities continued as though a contract were in place. Employees at the three facilities covered by the Master Agreement subsequently ratified the terms negotiated on July 18th and the Company's management was informed of the ratification. The new economic terms of the July 18th Memorandum of Agreement were promptly implemented by the Company. A one-time bonus of ten percent of wages for the previous year was paid by the Company during the week of August 19, 1985, to approximately 500 employees who had been on the payroll on July 1, 1985. A four percent cost-of-living increase in holiday pay was also paid for holidays beginning with Labor Day, 1985. A sixteen dollar contribution

---

**2.** Similar side letter agreements reducing the damages owed by the Company for non-union production had been negotiated between the parties for more than twenty years.

**3.** The two sides began to talk in earnest on June 17th and 18th, at which time they agreed to extend the 1982–1985 contract through July of 1985.

**4.** Pubco had recently bought a controlling interest in the Company, subject to shareholder approval.

toward Blue Cross/Blue Shield for Coosa River employees choosing such coverage was paid in October of 1985 for the three previous months, and monthly thereafter.

On November 11, 1985, Rosenfeld met with Wilbur Daniels, executive vice president of the Union, to discuss non-union production. Rosenfeld proposed to reduce the penalty in proportion with the Company's declining sales. Daniels requested that the Company supply updated information on its non-union production. No decision on this issue was made at this meeting.

On November 27, 1985, Good sent Rosenfeld drafts of the new Master Agreement, Supplemental Agreements concerning the facilities under Union contract and a supplementary letter on the Pubco issues. Rosenfeld suggested several changes, and on January 31, 1986, Good sent Rosenfeld a revised Master Agreement, three Supplemental Agreements and two side letter agreements. Rosenfeld stated that the revised language was acceptable. Thus, the parties had reached an agreement on all issues except non-union production.

On January 22, 1986, Rosenfeld met with Daniels in New York and supplied him with the updated information on the Company's non-union production. Rosenfeld proposed imposition of a $1,000 per month penalty. Daniels noted that he needed to gain the assent of the Union president before accepting the proposal. Thus, the meeting ended with the non-union production issue outstanding.

On February 10, 1986, the Union was notified that all production and distribution at the Company had ceased. Union, non-union and import activities would all be discontinued, and the sewing plants represented by the Union would close in approximately one month. The Union requested a meeting to negotiate the terms of the closing.

The meeting was held in New York on March 18, 1986. At the beginning of the meeting, Daniels stated that the issue of non-union production had been mooted by cessation of all production. Rosenfeld shrugged, but did not verbally respond.

Rosenfeld made a severance pay proposal which the Union considered unreasonable, and Union officials indicated their intention to arbitrate the issue. Rosenfeld testified that he told the Union at this time that no collective bargaining agreement existed because the non-union production issue had not been resolved. Good and Daniels testified that no such statement was issued concerning the existence of the contract. Despite the conflicting testimony, the evidence is clear that later that day Daniels wrote a letter to Maurice Saltzman, the Company president, demanding that the documents sent by Good to Rosenfeld on January 31, 1986, be executed.

Also on March 18, 1986, Good sent a letter to the arbitrator requesting a date for arbitration of the severance pay issue. On April 3, 1986, Rosenfeld wrote a letter to the arbitrator stating that no contract existed and refusing to participate in the arbitration. On April 21, 1986, Good wrote a letter to the arbitrator restating the Union's position that a contract had been created on July 18, 1985, and the Union had waived its right to collect damages on March 18th when Daniels stated that the non-union production issue was moot.

## II.

The sole issue before this Court is whether the district court erred in finding that a collective bargaining agreement existed between the Company and the Union. More specifically, we must determine whether the agreement reached by the parties on July 18, 1985, was a binding agreement, or one contingent on the resolution of the non-union production issue.

The district court held that a binding agreement was reached by the parties on July 18, 1985. The court reasoned that the congratulatory air and sense of accomplishment exhibited by both sides at the conclusion of the July 17th and 18th negotiating session, and the subsequent course of conduct by the Company in implementing the terms of the agreement, suggested that

there was a meeting of the minds which resulted in the creation of a valid contract.[5]

The Union urges that we affirm the district court's finding. It argues that the parties reached a complete and final agreement on July 18th that was not made contingent on the resolution of the non-union production issue.

·The Company argues that a contract did not arise on July 18th. It argues that there was no meeting of the minds between the parties because there was still a dispute over a substantive term—non-union production. We disagree with the argument advanced by the Company and find that the district court did not err in holding that a valid collective bargaining agreement existed between the parties.

█ We begin our analysis by noting that a trial court's finding that a valid contract exists will not be set aside unless it is clearly erroneous. *Trustees of Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp.*, 724 F.2d 1458, 1459 (11th Cir.1983) (citation omitted). This factual determination will be deemed clearly erroneous only where it is against the clear weight of the evidence or when, upon review of the evidence, the appellate court "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

█ The principles controlling a determination of whether a collective bargaining agreement exists are well established. A meeting of the minds of the parties must occur before a labor contract is created. *Interprint Co.*, 273 NLRB 1863 (1985). Whether a collective bargaining agreement exists is a question of fact; technical rules of contract law are not strictly binding. *NLRB v. Truckdrivers, Chauffeurs and Helpers, Local Union No. 100*, 532 F.2d

569, 571 (6th Cir.), *cert. denied*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976) (citation omitted). The existence of a collective bargaining agreement does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms. *NLRB v. Haberman Construction Co.*, 641 F.2d 351, 355–56 (5th Cir.1981) (en banc) (citations omitted).

█ As a general rule, a contract does not arise if the union and management have not resolved a dispute over a substantive term. *United Steel Workers of America v. Rome Industries, Inc.*, 321 F.Supp. 1170, 1174 (N.D.Ga.), *aff'd in part*, 437 F.2d 881 (5th Cir.1970); *Luther Manor Nursing Home*, 270 NLRB 949 (1984), *aff'd*, *United Food and Commercial Workers Union, Local No. 304A v. NLRB*, 772 F.2d 421 (8th Cir.1985). However, parties can form a binding agreement which they intend to be final, despite leaving certain terms open for future negotiation. *Georgia Kraft Co., Woodcraft Division v. NLRB*, 696 F.2d 931, 937 (11th Cir.), *cert. granted*, 464 U.S. 981, 104 S.Ct. 421, 78 L.Ed.2d 357 (1983), *vacated in part and remanded*, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984); *NLRB v. Beckham, Inc.*, 564 F.2d 190, 194–95 (5th Cir.1977). Thus, under the applicable law, if the parties agreed to defer negotiation of the non-union production side letter as part of the July 18th agreement, then a binding contract exists. However, if the contract was made explicitly subject to resolution of the non-union production issue, it is not binding.

█ The district court's conclusion that a binding contract was reached by the parties on July 18th is not clearly erroneous. Our review of the facts reveals that the parties had reached agreement on all the other major issues [6] when they agreed to defer

---

5. The district court concluded that the binding contract was reduced to writing and consisted of the Master Agreement, Supplemental Agreement for the Bellaire, Coosa River and Cleveland facilities, and two side letter agreements, one regarding problems relating to Pubco and another appointing Charles F. Ipavec as arbitra-

tor, "all as modified by the Union's oral waiver of damages for violations of the non-union production provisions." Joint Appendix at 31.

6. The Pubco picketing issue and the naming of the arbitrator also remained unresolved. The Company's argument that these unresolved is-

modification of the letter governing non-union production for later negotiations in New York. The tone and temperament of the parties at the conclusion of the July 18th meeting suggested that a binding agreement had been reached; the inability to resolve remaining issues concerning non-union production was not considered to be detrimental to the validity of the agreement. We agree with the district court when it stated:

> [T]he testimony of company witnesses indicates that there was clearly agreement to table the issue of non-union production in the July 17th meeting.... There was no testimony that anyone at the July 17—18th meetings stated that the agreement they finally reached was subject to negotiation of the non-union production terms. Instead there was a sense of accomplishment and congratulations at the conclusion of that negotiating session.... Had any doubt remained about the outstanding issues, it is unlikely that there would have been anything more than cautious optimism at the conclusion of the July 18th meeting, instead of the perception that an accord had been reached. It is also unlikely that the parties would have failed to extend that 1982–1985 contract at the end of July if they felt that they were not working under a binding contract.

Joint Appendix at 26.

Also, the course of conduct by the Company after the July 18th meeting suggests that a contract had been formed. Grievances were processed as usual, and union dues were checked off. Of particular importance is the Company's implementation of the economic terms of the agreement. In this regard, the district court correctly noted:

> These actions on the part of the company were more than simply continuing its production operations until a contract was completed; they amounted to the payment to approximately five hundred employees of a substantial amount of money above the 1982–1985 contract

rates, which would undoubtedly not be repaid if the contract were "tentative" and later fell through. The ten percent bonus, which was promptly paid in August, 1985, was a particularly expensive outlay for the Company. There was no apparent need to pay this bonus in August if there were no binding agreement, since bonuses are not wages needed by the employees to avert a strike. Rational management would postpone such a large lump sum payment if it were not confident that an agreement had been reached.

Joint Appendix at 26–27.

Furthermore, the district court perceptively noted that the Company did not exhibit the sense of urgency that would be expected if the agreement was contingent upon resolution of the non-union production issue. Rosenfeld and Daniels did not meet until November of 1985 to discuss the side letter and their discussions did not resume until late January. As the district court found, almost six months "had passed during which the company maintains that its employees were not under contract; yet it never explicitly indicated that such was the situation, but rather behaved in all respects as though agreement had been reached." Joint Appendix at 27. Thus, the evidence specifically shows that there existed a meeting of the minds, and that the Company's actions indicate that there was no dispute over the validity of the agreement.

The Company argues that since extending the contract without resolving the issue of non-union production would have exposed it to damages and possibly an injunction, it is inconceivable that it would have entered into a contract before the details of the non-union production issue were resolved. We disagree. As the district court stated, "[t]he fact that resolution of the non-union production issue was quite important to Bobbie Brooks does not mean that it would not defer negotiation of the side letter limitations on liquidated damages." Joint Appendix 28. The Union did

sues highlights the fact that no contract existed is untenable. The Company's argument derives from its belief that before a contract can arise,

the parties must resolve in full detail all issues before them. This is not the law. *See Georgia Knight Co., Woodcraft Division,* 696 F.2d at 937.

not enjoy complete, unqualified leverage concerning this issue; it was faced with the potential loss of a large number of jobs if the Company discontinued production.[7] Indeed, the evidence demonstrated that in the past the parties cooperated with each other to limit the amount of damages. Also, the Company's offer of $1,000 per month penalty on January 22nd indicated that the penalty would not be large in comparison to total sales.

The Company also argues that the failure to extend the 1982–1985 agreement at the end of July, 1985, is evidence that no contract was reached. This argument actually works against the Company. The parties *had* extended the 1982–1985 agreement once to give themselves a chance to arrive at a new agreement. The failure, therefore, to extend it again was evidence that both parties believed they had reached a new agreement.[8]

Accordingly, for the reasons set forth above, we AFFIRM the judgment of the Honorable Ann Aldrich, United States District Court, Northern District of Ohio.

MILBURN, Circuit Judge, dissenting.

I respectfully dissent for the reasons that follow. Initially, I disagree with the standard employed by the majority in reviewing the district court's conclusion that a valid collective bargaining agreement exists between the parties. The majority holds that a district court's conclusion that a collective bargaining agreement exists, *or that any valid contract exists*, is a factual determination that will not be set aside unless it is *clearly erroneous*.

A determination by a court that a contract exists is a two-step determination. First, the court must determine what conduct took place, *a factual determination.* Then, it must decide what legal significance attaches to that conduct; *viz.*, whether the conduct gives rise to a legally enforceable and binding contract, *a question of law.* Therefore, a determination of whether a valid contract exists is a mixed question of fact and law which is subject to *de novo* rather than *clearly erroneous* review.

In *Cordovan Associates, Inc. v. Dayton Rubber Co.*, 290 F.2d 858 (6th Cir.1961), we explained our inherent authority to act independently and draw our own inferences and legal conclusions when we held that:

> [w]here a finding designated as a finding of fact is not in reality a finding of fact, but is a conclusion of law or a mixed finding of fact and conclusion of law, it is not binding on the appellate court. Where a finding is of an ultimate fact in the making of which is involved the application of legal principles, it is subject to [*de novo* ] review.

*Id.* at 860 (citations omitted). *Accord, Taylor & Gaskin, Inc. v. Chris–Craft Industries*, 732 F.2d 1273, 1277 (6th Cir.1984); *K & M Joint Venture v. Smith International, Inc.*, 669 F.2d 1106, 1111–12 (6th Cir. 1982). As the Ninth Circuit recently held in a case directly on point, when "[n]one of the relevant facts are in dispute ... [t]he only question is, given these facts, did the parties have a contract as a *matter of law?*" *Warehousemen's Union Local No. 206 v. Continental Can Co.*, 821 F.2d 1348, 1350 (9th Cir.1987) (emphasis supplied). In my view, the majority has improperly limit-

---

**7.** In order to accommodate the Company's problems with competition from non-union sources, the Union had always been willing to accept less liquidated damages and greater non-union production than was allowed by the Master Agreement. Thus, the Union's objective was to exert enough pressure on the Company to retain the optimal number of Union jobs without forcing the Company to succumb to its non-union competition.

**8.** The Company also argues that the Union's suggestion that the non-union's production issue was "moot" did not create a contract, and that even assuming the Company's offer was still on

the table, the Union's waiver of damages did not constitute an acceptance. We disagree. As we have found, an overall agreement already existed when the Union made this suggestion. Thus, the Company's argument has no merit.

In addition, there is no support for the Company's argument that the district court erroneously relied on the parties' sense of accomplishment to predicate a finding that a contract arose. Although mutual mistake may void an agreement, there is no evidence here that the parties were in error in believing that they had reached an agreement.

ed our review to the clearly erroneous standard.

I further disagree with the majority's conclusion that a valid and enforceable collective bargaining agreement was reached between the parties. I agree that a contract does not arise if union and management have not resolved a dispute concerning a substantive term of the contract. However, I cannot agree with the majority's holding that a collective bargaining agreement can be binding and enforceable despite certain terms being left open for future resolution.

Any discussion in this area of labor law must begin with the Supreme Court's holding in *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), which is not referred to in the majority opinion. In *H.K. Porter*, the Supreme Court made it clear that *if a union and company are unable to reach agreement on an issue being negotiated, neither the federal courts nor the NLRB have the authority to bind the parties to any aspect of the agreement to which they cannot reach agreement.*

The object of this Act was not to allow governmental regulation of the terms and conditions of employment, but rather to insure that employers and their employees could work together to establish mutually satisfactory conditions. The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years will be channeled into constructive, open discussions leading, it was hoped, to mutual agreement. *But it was recognized from the beginning that agreement might in some cases be impossible, and it was never intended that the Government would in such cases step in, become a party to the negotiations and impose its own views of a desirable settlement.*

*Id.*, 397 U.S. at 103–04, 90 S.Ct. at 823 (emphasis supplied). The Court discussed the powers of the federal government under the Act and held:

[t]he Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. *One of these fundamental policies is freedom of contract. While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.*

*Id.* at 108, 90 S.Ct. at 826 (emphasis supplied, footnotes omitted). Finally, the Court concluded:

the Act ... does not contemplate that unions will always be secure and able to achieve agreement even when their economic position is weak, or that strikes and lockouts will never result from a bargaining impasse. It cannot be said that the Act forbids an employer or a union to rely ultimately on its economic strength to try to secure what it cannot obtain through bargaining.

*Id.* at 109, 90 S.Ct. at 826. As the Supreme Court has reiterated in holdings subsequent to *H.K. Porter*, neither the NLRB nor the federal courts have the power to impose on parties to a potential collective bargaining agreement any terms to which the parties did not themselves agree or reach a meeting of the minds. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 534, 104 S.Ct. 1188, 1200, 79 L.Ed.2d 482 (1984); *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *see also Heheman v. E.W. Scripps Co.*, 668 F.2d 878, 879 (6th Cir.) (Weick, J., dissenting from a denial for a rehearing *en banc*), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982).

The majority holds that if parties have reached agreement on all but one issue and have agreed to table the resolution of that issue until a later date, a valid and enforceable collective bargaining agreement exists. The majority relies upon *Georgia Kraft Co., Woodcraft Division v. NLRB*, 696 F.2d 931, 937 (11th Cir.), *cert. granted*,

464 U.S. 981, 104 S.Ct. 421, 78 L.Ed.2d 357 (1983), *vacated in part and remanded*, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984); and *NLRB v. Beckham, Inc.*, 564 F.2d 190, 194–95 (5th Cir.1977).[1] However, when the issue is examined within the parameters of *H.K. Porter*, as it must, then the error of the majority opinion becomes clear. The majority presumes that agreement will always be reached in the future on every issue tabled. The history of the labor movement in this country obviously disproves any such presumption. If the parties are unable to reach agreement on the issue tabled, as is quite possible, an earlier pronouncement by a federal court that a valid and enforceable contract existed would preclude either party from exercising the economic weapons normally available to them, economic weapons that the Supreme Court in *H.K. Porter* made quite clear the federal courts are not to disturb. In such a situation, the employees could not go on strike and the employers could not have a lockout because such conduct would violate the collective bargaining agreement the court had previously found to exist.

Prior to the company's decision to cease operations in this case, which implicitly revoked any outstanding offers concerning a then needless collective bargaining agreement, the union had unequivocally insisted that there was *absolutely no way they could agree to a contract containing no nonunion production limitation.* Otherwise, the union insisted, all other employers would insist on a similar contract. In fact, testimony from the union revealed that every contract since the 1930s had contained a nonunion production clause limiting such production, and that the nonpro-

duction clause was the "linch-pin" of the agreement.

As the majority notes, in order for the district court to enforce the arbitration clause of the contract, it had to first determine the scope of the contract. In doing so, the district court held that a contract existed between the parties consisting of what they had previously agreed on, but *absent any liquidated damage clause for violation of the nonunion production provision.* Thus, when the district court fashioned a contract between the parties containing no damages for nonunion production, the court in effect "drafted" an agreement to which the union had previously refused to agree to, and one upon which there was no meeting of the minds. While a federal court is empowered to enforce labor contracts, it does not have the power to draft them.

Because I feel that the majority has employed the wrong standard of review and has improperly approved the involvement of the federal judiciary in the collective bargaining process, I respectfully dissent. I would REVERSE the judgment of the district court and REMAND for further proceedings.

---

1. A careful reading of *Georgia Kraft* reveals that it does not stand for the proposition supported by the majority. The Eleventh Circuit did not hold that parties could table an issue and thereby have an enforceable bargaining agreement. In *Georgia Kraft*, the Eleventh Circuit found that the issue in dispute, striker discipline, "was never intended to be a contractual provision," and therefore could not be "an impediment to a collective bargaining agreement." *Georgia Kraft*, 696 F.2d at 937. The other issue in *Geor-*

*gia Kraft* was whether or not acceptance was timely. It does not stand for the proposition that parties can table resolution of a contract provision and still have a collective bargaining agreement. An examination of *Beckham*, the only reported case truly supporting the majority's position, reveals that it was far from a unanimous opinion, as a member of the panel strongly dissented. *Beckham*, 564 F.2d at 195–97 (Fay, J., dissenting).