52 F.3d 324
 150 L.R.R.M. (BNA) 2575
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AIRCRAFT BRAKING SYSTEMS CORPORATION, Plaintiff-Appellant,
v.
LOCAL 856, INTERNATIONAL UNION, UNITED AUTO, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS, Defendant-Appellee,
American Arbitration Association, Inc. Defendant.
 No. 93-3614.
 United States Court of Appeals, Sixth Circuit.
 April 21, 1995.
 
 Before: MILBURN and RYAN, and GODBOLD*, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiff Aircraft Braking Systems Corporation ("ABS") appeals the district court's order denying its motion for a preliminary injunction and granting the counterclaim of defendant, Local 856, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America ("Union"), to compel arbitration of a labor grievance. On appeal the issues are (1) whether the district court erred in finding that there was an enforceable interim agreement between the parties which required arbitration of their labor dispute and (2) whether the district court erred in entering a final order based upon the Union's application for a preliminary injunction without giving notice of advancement and consolidation for trial on the merits. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 This case involves a labor dispute between ABS and defendant Union. The Union is the certified bargaining representative for ABS's production and maintenance employees. ABS and the Union were parties to a collective bargaining agreement which, by its own terms, expired on August 10, 1991. Prior to the August 10, 1991 expiration of the collective bargaining agreement, ABS and the Union entered into negotiations for a new agreement; however, they were unable to reach agreement on the terms of a new collective bargaining agreement.
 
 
 3
 On August 10, 1991, ABS informed the Union that it was implementing the terms of its "Final Proposal" to the Union, on the grounds that the parties had reached an impasse in their bargaining. The "Final Proposal" stated in relevant part:
 
 
 4
 The Contract between U.A.W., Local # 856 and Aircraft Braking Systems Corporation which by its terms expires at 6:00 PM August 10, 1991, is hereby extended and renewed for a period of three years from August 10, 1991, or the date of ratification whichever is later except as specifically amended hereafter.
 
 
 5
 * * *
 
 
 6
 3. Employees on the active payroll as of August 10, 1991, shall receive a lump sum payment of $800.
 
 
 7
 * * *
 
 
 8
 14. All Company proposals dated June 20, 1991, and all tentative agreements will be incorporated into the Basic Labor Agreement ... except as modified by the attached Company proposals.
 
 
 9
 J.A. 17-18; 57-58.
 
 
 10
 The existing collective bargaining agreement between the parties, which expired on August 10, 1991, contained both an arbitration clause and a no-strike clause. One of the proposals made by ABS on June 20, 1991 was to change paragraph 193 of the existing collective bargaining agreement to read:
 
 
 11
 The parties to this agreement will utilize the services of the American Arbitration Association when the need for arbitration arises.
 
 
 12
 J.A.59.
 
 
 13
 This resulted in a unilaterally imposed "Final Proposal" which reads in relevant part:
 
 Section 2. Grievance Procedure
 
 14
 * * *
 
 Step 4
 
 15
 It is hereby agreed that should the above procedure fail to bring about an agreement between the parties with respect to certain grievances, either party may within twenty (20) workings days after the final written answer as outlined in the agreement above submit the issue to an arbitrator, selected by mutual agreement.
 
 
 16
 * * *
 
 
 17
 181 The parties to this agreement will utilize the services of the American Arbitration Association when the need for arbitration arises.
 
 
 18
 * * *
 
 
 19
 184 Specifically the Arbitrator shall not have the power to arbitrate general wage levels or maximum or minimum rates of existing classifications, and the only grievances which may be submitted to the said Arbitrator for hearing and determination shall be those arising out of alleged violation or misinterpretation of the provisions of this agreement; or individual rate grievances within the employee's classification (classification in this instance shall include the subdivision).
 
 
 20
 ...........................................................
 
 
 21
 ...................
 
 
 22
 * * *
 
 ARTICLE V. WORK STOPPAGE
 Section 1. No Strike or Lockout
 
 23
 203 It is the express desire of the parties to this Agreement that the procedures contained herein will serve the purpose of affecting a peaceable settlement of all disputes that may arise between them. As long as this Agreement is in effect, the Company will not lock out any employees. As long as this Agreement is in effect, the Union will not cause or permit its members to cause, nor will any employee take part in any strike, sit-down, stay-in or slow-down, or any curtailment of work or restriction of production, or picketing, or interference with production of the Company in any matter which comes within the jurisdiction of the Arbitrator.
 
 
 24
 J.A. 199, 201-03, 206.
 
 
 25
 Subsequently, on September 3, 1991, the Union filed a grievance, grievance A-8700, with ABS, claiming that plaintiff violated the unilaterally implemented contract by refusing to pay the $800 lump sum payment promised in paragraph 3 of the "Final Proposal." J.A. 19. Moreover, although the members of the Union declined to ratify the unilaterally imposed "Final Proposal" of ABS, and an impasse was reached, they continued to work under the terms of the "Final Proposal" and were paid wages and benefits pursuant to the "Final Proposal." Furthermore, it is undisputed that there has been no strike since the August 10, 1991 implementation of ABS's "Final Proposal."[1]
 
 B.
 
 26
 On April 22, 1993, ABS filed a complaint and an application for a temporary restraining order seeking a declaratory judgment under 9 U.S.C. Sec. 2, 28 U.S.C. Sec. 2201, 29 U.S.C.A. Secs. 101, 160(b), and Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 65, that grievance A-8700 did not involve and arbitrable controversy and that grievance A-8700 was time barred. It also sought temporary and permanent injunctive relief enjoining the Union from proceeding to arbitration on grievance A-8700. On that same date, ABS also filed a separate motion for a preliminary injunction against the arbitration of grievance A-8700.
 
 
 27
 The Union filed an Answer and a counterclaim to compel arbitration of grievance A-8700 on April 28, 1993. A hearing was held on ABS's motion for a preliminary injunction on April 28, 1993.
 
 
 28
 Edward L. Searle, Director of Human Resources for ABS, testified at the hearing in district court that his responsibilities at ABS included total responsibility for "labor relations, grievance resolution, bargaining, benefits administration, and training." J.A. 107-08. Searle testified that on August 10, 1991, he presented a copy of ABS's "Final Proposal" to the Union's Executive Bargaining Committee, that he indicated to the Executive Bargaining Committed that as a result of meetings between ABS and the Union, ABS believed that the parties had reached impasse in their negotiations for a new collective bargaining agreement, and that ABS would implement its "Final Proposal" at 6:01 p.m. on August 10, 1991. Searle testified that at the August 10, 1991 meeting with the Executive Bargaining Committee, he went through the items in the "Final Proposal," one by one, and that he indicated to the Executive Bargaining Committee that the "items related to lump sum payments were contingent on ratification and we would not process any lump sum payments until the contract had been ratified." J.A. 110. Searle also testified that on or about October 1, 1991, he sent a letter to Don Hurr, the Chairman of the Executive Bargaining Committee of Local 856, indicating that it was obvious to ABS that the Union was not going to ratify ABS's "Final Proposal" and that ABS was going to proceed to implementation of its "Final Proposal" without ratification. Searle further testified that in the letter he reminded the Executive Bargaining Committee that the lump sum payments set forth in the "Final Proposal" would not be made until after ratification by the Union.
 
 
 29
 Searle described the four step grievance procedure set forth in ABS's "Final Proposal." The first step of the grievance procedure involves an oral grievance made at the floor level with the chief steward and the supervisor. If the grievance is not resolved at the floor level, it proceeds to step 2, where the grievable issue is addressed between the Union Committee Person and ABS's Department Manager. If the grievance is not resolved at step 2, it proceeds to step 3. At step 3, the Union's Executive Bargaining Committee reviews the matter, and if they feel it has merit, they write a formal grievance which is presented to ABS, at which time a step 3 meeting is held. ABS has ten days to give a written answer to the union. Once the written answer is issued by ABS, the Union has 20 days to certify the grievance to arbitration, which is step 4 of the procedure. J.A. 115.
 
 
 30
 Searle testified that he received a copy of grievance A-8700 on September 5, 1991, that grievance A-8700 was written by the Executive Bargaining Committee, that it was presented to the company, that it was addressed in a step 3 meeting, that it was answered, and the Union certified the grievance to arbitration. Specifically, on November 18, 1991, Searle sent another letter to Don Hurr in which he indicated that a step 3 meeting on grievance A-8700 had been held on November 6, 1991. The letter further stated that:
 
 
 31
 It continues to be the position of the Company that the payment of the $800 lump sum is contingent upon the ratification of the Contract. As of this date the Contract has not been ratified. Consequently, Grievance A-8700 is denied.
 
 
 32
 J.A. 33.
 
 
 33
 Finally, on direct examination, Searle testified that in September 1992, he received notification from the Union that it was going to seek an arbitrator to hear grievance A-8700. J.A. 116. Searle stated that on March 3, 1993, he received a letter from the American Arbitration Association ("AAA"), requesting that the Union and ABS indicate their choice of an arbitrator from a list of arbitrator's names which had been enclosed along with the letter. Thereafter, on March 8, 1992, Searle sent a letter to AAA stating ABS's position that the $800 lump sum payment was not a proper issue for arbitration and indicating that ABS would not respond to AAA's request for identification of arbitrators. Subsequently, on March 16, 1993, and again on April 1, 1993, AAA sent a letter to ABS and the Union, indicating that "in the absence of an agreement by the Parties or a court order staying this matter," AAA would proceed to arbitration. J.A. 28, 30.[1]
 
 
 34
 On cross-examination, Searle admitted that grievance A-8700 was filed and certified in a timely manner. J.A. 138. Searle also admitted that ABS and the Union had an arbitration, pursuant to the grievance procedure set forth in ABS's "Final Proposal", scheduled for the day after the hearing. Searle further admitted that ABS had arbitrated other grievances with the Union since August 10, 1991. According to Searle, "[w]e went to arbitration on one grievance, and as a result of working with the Arbitrator we resolved 30 grievances." J.A. 145. In addition, Searle admitted that through AAA, an arbitrator by the name of Nicholas Duda had been selected as an arbitrator to hear the grievances. J.A. 145. Moreover, Searle admitted that ABS had agreed to arbitrate approximately 33 grievances, because the NLRB decided to defer to the arbitration process set forth in the "Final Proposal". Finally, Searle admitted that in September of 1992, when the Union wrote to him and told him that they were certifying grievance A-8700 for arbitration, he did not tell the Union that the grievance was not arbitrable.
 
 
 35
 Donald Hurr, the chairman of the Executive Bargaining Committee of Local 856, also testified at the hearing. Hurr testified that "[i]t was never brought across the [bargaining] table that there was a precondition for the [$]800 [lump sum payment]." J.A. 155. Hurr further testified that after the Union filed grievance A-8700, ABS's response was "if you ratify the contract we'll give you the $800." J.A. 155-56. According to Hurr, he was never informed at any time prior to March of 1993, that ABS believed that grievance A-8700 was not arbitrable. However, Hurr admitted that as of October 1991, he was aware of ABS's position concerning payment of the lump sum payments.
 
 
 36
 Hurr also testified that after ABS implemented the terms of its "Final Proposal," the union members continued working. Hurr further testified that there has been no strike at ABS since August 10, 1991, and that a strike was not contemplated in the future. Finally, Hurr testified that the Union "had not signed a contract" with ABS, but that the Union continues to work under the terms of ABS's "Final Proposal" and ABS continues to follow the terms of its "Final Proposal" except for the payment of the $800 lump sum. J.A. 161, 164.
 
 
 37
 On May 14, 1993, the district court denied ABS's application for a preliminary injunction and granted the Unions's counterclaim, ordering ABS to submit grievance A-8700 to binding arbitration. In its order, the district court made detailed findings of fact, concluding that
 
 
 38
 every tangible indicia of the intent of the parties shows that both sides believed and behaved according to the view that a grievance-arbitration agreement was in force between the parties. It is impossible for this court to conclude otherwise. ...
 
 
 39
 [ABS's] decision to unilaterally implement a contract is plainly an offer for "interim" employment. ... acceptance of such an offer is manifested by continuing performance. The unilateral offer contained as one of its terms an agreement to arbitrate grievances.
 
 
 40
 ...........................................................
 
 
 41
 ...................
 
 
 42
 * * *
 
 
 43
 Plaintiff's unilateral offer for interim employment was accepted. ... the union has agreed to comply with the terms of interim employment while continuing to seek a more advantageous permanent agreement. ... Most telling of all, the employees have continued to work for over 20 months under the imposed terms without violation of the no-strike clause.
 
 
 44
 * * *
 
 
 45
 In sum, an agreement to arbitrate does exist and the instant grievance [A-8700] is within the terms of that arbitration agreement.
 
 J.A.294-96. This timely appeal followed.[2]
 II.
 A.
 
 46
 ABS argues that the district court abused its discretion in both denying ABS's motion for a preliminary injunction staying the arbitration of grievance A-8700 and in granting the Union's motion to compel binding arbitration of grievance A-8700. ABS asserts that the district court erred in finding that the Union manifested its acceptance of ABS's unilateral offer of "interim" employment in its "Final Proposal" by abiding by the terms and conditions of employment set forth in the "Final Proposal" and by abiding by the no-strike provision set forth in the "Final Proposal." ABS further asserts that because it "unilaterally implemented its ["Final Proposal"] incorporating terms and conditions of employment under which the parties have been working since August 10, 1991, "the provisions in the "Final Proposal" have never been implemented because they have never been ratified by the Union's membership. Brief of Appellant at 10.
 
 
 47
 "A meeting of the minds of the parties must occur before a labor contract is created." Bobbie Brooks, Inc. v. International Ladies Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir.1987). "Whether a collective bargaining agreement exists is a question of fact; [the] technical rules of contract law are not strictly binding." Id. (citing National Labor Relations Bd. v. Truckdrivers, Chauffeurs and Helpers, Local Union No. 100, Int'l Bhd. of Teamsters, Chauffers, Warehousemen and Helpers of America, 532 F.2d 569, 571 (6th Cir.), cert. denied, 429 U.S. 859 (1976). A district court's "finding that a valid contract exists will not be set aside unless it is clearly erroneous." Id. (citing Trustees of Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp., 724 F.2d 1458, 1459 (11th Cir.1983) (per curiam). "This factual determination will be deemed clearly erroneous only where it is against the clear weight of the evidence or when, upon review of the evidence, the appellate court 'is left with the definite and firm conviction that a mistake has been committed.' " Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). " 'If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " Central States Southeast and Southwest Areas Pension Fund v. Kraftco, 799 F.2d 1098, 1109 (6th Cir.1986), cert. denied, 479 U.S. 1086 (1987) (en banc) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985)). Further, ever greater deference is accorded to a district court's findings based upon witness credibility, " 'for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in [what] is said.' " Id. (quoting Anderson, 470 U.S. at 575).
 
 
 48
 In this case, the district court was called on determine whether ABS and the Union were required to arbitrate their dispute concerning the $800 lump sum payment set forth in ABS's "Final Proposal." "Arbitration is a preferred method of settling labor disputes.' " Cincinnati Typographical Union No. 3, Local 14519, Communications Workers of America, AFL-CIO v. Gannett Satellite Information Network, Inc., 17 F.3d 906, 909 (6th Cir.1994) (citing 29 U.S.C. Sec. 173(d)). However, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. "A party's agreement to arbitrate is a matter of contract construction and whether a dispute is arbitrable under a collective bargaining agreement is a question of law for the court." Cumberland Typographical Union No. 244 v. Times and Alleganian Co., 943 F.2d 401, 404 (4th Cir.1991). Moreover, "[i]f the court determines that the matter in dispute is a matter designated for arbitration by the parties in their contract, Section 301(a) of the LMRA allows the specific enforcement of the arbitration agreement." Id. (citing Textile Workers Union v. Lincoln Mills of Alabama, 353 U.S. 448, 450-51 (1957)).
 
 
 49
 The Supreme Court has set forth four principles as a guide to determine whether a labor dispute is arbitrable:
 
 
 50
 Under the first principle, the parties must have contracted to submit the grievance to arbitration. The second principle requires that the court determine whether the contract provides for arbitration of the particular grievance in question. The third principle demands that the court not decide the merits of the grievance while determining the arbitrability of the dispute. Finally, if the contract contains an arbitration clause, a presumption of arbitrability arises. The court should not decline to order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."
 
 
 51
 Id. (quoting AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986)). "The Court has thus made it clear that, except for matters specifically excluded from arbitration in the collective bargaining agreement, all questions on which the parties disagree must be submitted to arbitration." Id. (citing United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593 (1960)).
 
 
 52
 Consequently, "courts have liberally construed traditional contract law in this area because of the strong congressional policy favoring arbitrability." United Paperworkers Int'l Union v. International Paper Co., 920 F.2d 852, 855 (11th Cir.1991). "Moreover, all that is required to find the existence of a collective-bargaining agreement is conduct by the parties manifesting an intention to be bound." Id. "There is no independent requirement in federal law of ratification [of a collective bargaining agreement] by a union." Kraftco, 799 F.2d at 1111. "A collective bargaining agreement must be ratified by a union's membership only if the union's constitution, by-laws or rules and regulations create such a requirement." Id. Furthermore, the existence of the collective bargaining agreement does not even depend on its "reduction to writing, it can be shown by conduct manifesting an intention to abide by the agreed-upon terms." Bobbie Brooks, 835 F.2d at 1168.
 
 
 53
 In United Paperworkers Int'l Union v. International Paper Co., the Eleventh Circuit upheld the district court's finding that the company's unilateral implementation of its final offer, and the union's subsequent commitment to continue working and not to strike without ten days' notice to the employer, created an implied, interim contract that included an obligation to arbitrate grievances. United Paperworkers, 920 F.2d at 855. As the Eleventh Circuit stated:
 
 
 54
 When the Company decided to implement unilaterally a modified version of its final offer, the Union and the Union-represented employees were still faced with the decision of whether to accept the offer of interim employment and to continue working or to strike. We have no conceptual difficulty in understanding that an employment arrangement that was unacceptable as a permanent, formal agreement might still be acceptable as a temporary, stop-gap measure.
 
 
 55
 Id. at 857. Further, the Eleventh Circuit held that "[d]uring the entire period of interim employment, ... the Union-represented employees continued to work; and the Union never called for a work stoppage. The conduct of the Union and Union-represented employees was sufficient to manifest acceptance of the unilaterally imposed terms of employment." Id. at 857-58. More specifically, the Eleventh Circuit held that
 
 
 56
 the Union here has not only claimed that the Union accepted the Company's offer of interim employment, but the Union has proffered uncontradicted evidence to buttress that claim. The uncontroverted evidence shows the Union expressly agreed that the employees it represents would continue working under the Company's unilaterally implemented offer and that the Union would not call a strike without a ten-day notice. In the circumstances of this case, when the Union agreed to give up portions of its usual arsenal of economic weapons and the Union-represented employees continued working in reliance of [sic] the terms of the Company's implemented offer, there is, as a matter of law, enough to manifest the Union's intention to be bound by the temporary agreement.
 
 
 57
 Id. at 860.
 
 
 58
 Furthermore, in United Paperworkers, the Eleventh Circuit also distinguished the decisions of the Tenth Circuit in United Food & Commercial Workers Int'l Union, AFL-CIO, Local 7 v. Gold Star Sausage Co., 897 F.2d 1022 (10th Cir.1990) and International Union, United Mine Workers of America v. Big Horn Coal Co., 916 F.2d 1499, 1501-02 (10th Cir.1990) (per curiam), cert. denied, 502 U.S. 1095 (1992). In Gold Star, the Tenth Circuit rejected the Union's arguments that certain of its employee grievances were arbitrable under the terms of the employer's unilaterally implemented final offer on the grounds that the unilateral offer was not a contract between the parties. Gold Star, 897 F.2d at 1026. As the Eleventh Circuit noted however, "the Gold Star court made clear ... that 'the Union does not even allege that the Company's last offer is, in some sense, a contract between the parties, much less point to any facts in the record that might support such an assertion.' " United Paperworkers, 920 F.2d at 858 (quoting Gold Star, 897 F.2d at 1026). Finally, the Eleventh Circuit concluded its analysis by stating:
 
 
 59
 [T]he Tenth Circuit opinions can be cited for the proposition that such additional evidence of union acceptance does establish an interim contract created by an implemented final offer:
 
 
 60
 "Employer implementation of a last and final offer is, by itself, insufficient to invoke jurisdiction absent some manifestation of acceptance of the offer sufficient to create a contract.... The contract between the parties required for jurisdiction need not be a written, signed collective-bargaining agreement, but may exist as any informal agreement between the parties significant to the maintenance of labor peace between them. It suffices that the parties' intent to abide by the agree-upon provisions of any such informal agreement is in some manner manifest."
 
 
 61
 Big Horn, at 1501-1502 (emphasis added) (citing Gold Star, 897 F.2d at 1026) ...
 
 
 62
 Id. at 858.
 
 
 63
 Furthermore, the reasoning of the Eleventh Circuit in International Paper is in accord with precedent in this Circuit. See International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers--Local 1603 v. Transue & Williams Corp., 879 F.2d 1388 (6th Cir.1989), in which we stated:
 
 
 64
 In the case at bar, the district court correctly found that Transue and the Union agreed to adhere to the grievance and binding arbitration provisions of the 1986 Contract. Transue accepted, processed, and responded to over fifteen grievances pursuant to the procedures established by the 1986 Contract. During this period of operations without a formal collective bargaining agreement, the Union did not strike, picket or resort to the use of any economic weapons, but continued to work for the new pay rates negotiated in the 1986 Contract. Thus, both the Union and Transue evidenced, by their conduct, an intent to remain bound to the grievance and arbitration provisions of the 1986 Contract. .. Moreover, both parties, especially Transue, benefitted from the resultant "industrial peace" and the common belief that there was an agreed upon dispute resolution procedure.
 
 
 65
 Transue, 879 F.2d at 1393.
 
 
 66
 However, our decision in International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local Union 1199 v. Pepsi-Coal General Bottlers, Inc., 958 F.2d 1331 (6th Cir.1992), relied on by ABS is distinguishable from this case. In Pepsi-Cola the Company refused to submit the grievance of a terminated Union member to binding arbitration. The events giving rise to the grievance occurred during the hiatus period, the period between the expiration of an old collective bargaining agreement and the implementation of a new agreement. The Union sued, advancing a number of theories as support for its argument that Pepsi had a contractual duty to submit the grievance to arbitration. Among other things, the Union argued that it "entered into an implied agreement [with Pepsi] to arbitrate grievances during the period between the effective dates of the old and new collective bargaining agreements." Id. at 1333.
 
 
 67
 We rejected the Union's argument that the facts in Pepsi-Cola showed conduct manifesting an intention to abide by the terms of the alleged agreement to arbitrate difference during the hiatus period. We stated that
 
 
 68
 [a]fter the old collective bargaining agreement expired, Pepsi terminated dues deductions even though dues deductions were not a disputed provision of the old agreement. Furthermore, [the Union] called a strike during the hiatus period which would have violated the no-strike clause of the old collective bargaining agreement. Generally, an express or implied no-strike clause is the quid pro quo for the employer's agreement to arbitrate grievances.
 
 
 69
 Id. at 1335 (citations omitted).
 
 
 70
 In this case, however, there was no strike called by the Union at any time after ABS's implementation of its "Final Proposal." Furthermore, as found by the district court there was ample evidence, as manifested by the conduct of both parties, that they intended to be bound by the provisions of the "Final Proposal," particularly the grievance arbitration provision. Not only had there been no strike, but Don Hurr, the Chairman of the Executive Bargaining Committee of Local 856, testified that there were no plans to call a strike in the future.[3]
 
 
 71
 Moreover, not only had the Union members continued to work under the provisions of the "Final Proposal," but ABS and the Union had used the grievance arbitration procedure in other instances. As Edward Searle testified at the hearing, the Union and ABS had selected an arbitrator from AAA, as provided in the "Final Proposal," and an arbitration was scheduled the day after the hearing before the district court. In its opinion, the district court found that "[t]he record clearly supports the conclusion that plaintiff is willing to invoke the mandatory grievance-arbitration clause of the imposed contract as both a sword and shield in dealing with its own employers (sic)." J.A. 293-94.
 
 
 72
 Furthermore, although ABS places great reliance on the Union's failure to ratify the "Final Proposal," the record shows that the Union manifested its acceptance of ABS's unilaterally imposed "Final Proposal" as an interim contract. Although the Union members failed to ratify the "Final Proposal" as a permanent collective bargaining agreement, the actions of the Union in continuing to work under the terms of the "Final Proposal" without striking as well as the actions of both parties in using the grievance arbitration procedure set forth in the "Final Proposal," manifest acceptance of the "Final Proposal." Accordingly, we conclude that in this case, the district court's findings that the actions of the Union demonstrated acceptance of ABS's "Final Proposal," namely, an implied interim contract containing an agreement to arbitrate was not clearly erroneous, and the district court properly applied the law to the facts of this case.[4]
 
 B.
 
 73
 ABS argues that the district court erred pursuant to Fed.R.Civ.P. 65(a)(2) when it consolidated the hearing on the Union's motion for a preliminary injunction with the merits of the case and granted a final order without giving notice to ABS. ABS asserts that without notice of the advancement of its case on the merits, it had no opportunity to fully prepare and present its case on the merits. Fed.R.Civ.P. 65(a)(2) provides in relevant part:
 
 
 74
 Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.
 
 
 75
 The Union responds, relying on our decision in United Bhd. of Carpenters and Joiners of America, Dresden Local No. 267 v. Ohio Carpenters Health and Welfare Fund, 926 F.2d 550 (6th Cir.1991), that ABS had the opportunity to defend the Union's counterclaim and that ABS waived its right to further proceedings. The Union points out that following the hearing on ABS's motion for a preliminary injunction on April 28, 1993, counsel for ABS requested the opportunity to submit post hearing briefs. The district court then gave the parties one week to submit simultaneous post-hearing briefs. ABS filed its post-hearing brief on May 5, 1993, and its answer to the Union's counterclaim on May 6, 1993. In its post hearing brief, ABS requested "that a preliminary injunction be granted and further that a permanent injunction be issued based upon the record." J.A. 249. Consequently, the Union asserts that ABS indicated its satisfaction with the state of the record to the district court and waived any objections to the closing of the record. Brief of Appellee at 32.
 
 
 76
 The Union, however, misapprehends the effect of our holding in United Brotherhood. United Brotherhood does not stand for the proposition that ABS has waived its objection to the district court's failure to give notice under Fed.R.Civ.P. 65. Rather based on our decision in United Brotherhood, ABS cannot show any prejudice arising from the district court's failure to give notice, and, thus, the failure to give notice was harmless error.
 
 
 77
 In United Brotherhood, the plaintiff Union argued that the district court erred in sua sponte dismissing its complaint without giving the Union notice of its intent to dismiss as required by this court's decision in Tingler v. Marshall, 716 F.2d 1109 (6th Cir.1983). We stated:
 
 
 78
 It is difficult to credit these claims of prejudice. [The Union] made a very effective response to the court's sua sponte motion to dismiss by filing a memorandum in opposition. The court fully considered appellant's position. On appeal, the [Union] re-argued the same issues in the same way, thereby giving rise to a very strong inference that the legal position taken in the memorandum filed with the trial court reflected the [Union's] mature position. In addition, the [Union] does not indicate what additional measures it might have taken ... We conclude therefore that the court's proceedings.... resulted in no prejudice to [the Union].
 
 
 79
 United Brotherhood, 926 F.2d 558.
 
 
 80
 Similarly, in this case, ABS filed a post-hearing brief which indicated its satisfaction with the state of the record. Further in its brief on appeal, ABS has reargued the same issue in the same way and relied on the same evidence. More importantly, in its brief on appeal, ABS did not indicate what additional evidence it would have presented if it had received notice from the district court.[5] Accordingly, we conclude that ABS was not prejudiced by the district court's failure to give notice under Fed.R.Civ.P. 65. Therefore, error, if any, on the part of the district court was harmless error.
 
 III.
 
 81
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable John C. Godbold, United States Circuit Judge for the Eleventh Circuit, sitting by designation
 
 
 [1]
 On August 11, 1991, the Union filed an unfair labor practices charge against ABS with the National Labor Relations Board ("NLRB"). The unfair labor practices charge stated that, among other things, that one of the actions taken by ABS which constituted an unfair labor practice was "[i]mplementing a final offer prior to the existence of a good faith bargaining impasse." J.A. 20. The Union withdrew its unfair labor practices charge on or about October 23, 1991. J.A. 21
 The Union also filed another unfair labor practices charge with the NLRB on or about December 6, 1991. This unfair labor practices charge was eventually settled in part. J.A. 122. The settlement "referred to the ... charge [of] dealing directly with employees while bypassing the union, under threat of plant relocation." J.A. 125.
 
 
 [1]
 The letter of April 1, 1993, also indicated that AAA had selected John E. Drotning to serve as the arbitrator for grievance A-8700. J.A. 30
 
 
 [2]
 Subsequently, grievance A-8700 was arbitrated and the arbitrator issued an award in favor of the Union. ABS filed a second action in the district court, seeking to have the arbitrator's award vacated. Thereafter, on January 8, 1994, ABS filed a motion with this court seeking to have this case remanded to the district court, for consolidation and trial with its action to vacate the arbitrator's award. It was ABS's position that the district court's order compelling arbitration was an interlocutory order. In an order dated March 7, 1994, we concluded that "the district court's order compelling arbitration is final," and we denied the motion to remand. See Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto, Aerospace and Agricultural Implement Workers, No. 93-3614 (6th Cir. Mar. 7. 1994) (order)
 
 
 [3]
 On August 16, 1991, E.L. Searle, ABS's director of Human Resources sent a letter to the Union advising it that any members of the Union who engaged "in a ... sit-down, stay-in, slow-down, or any curtailment of work, or restriction or interference with production ... will be terminated." R. 239. Further, on January 29, 1992, the regional director of the NLRB sent a letter to the parties in this case referring to a grievance which concerned ABS's discharge of 33 employees. R. 237. In his letter, the regional director indicated that the NLRB was deferring action on the grievance because the grievance "was pending in the actual grievance procedure." R.237. At oral argument counsel for ABS asserted that the 33 employees were terminated because they had engaged in a slow-down. There is no evidence of record which supports this assertion. However, even if the employees who were terminated had been involved in a slow-down, this would not change our conclusion. The record, or at least the scant record relating to this issue, indicates that the parties resorted to the grievance procedure to resolve the dispute referred to in the letter of January 29, 1992. Thus, in January 1992, the parties were behaving as if they had a contract, a contract which included an agreement to resolve disputes by arbitration
 
 
 [4]
 ABS argues that the district court's decision in this case "would destroy a union's bargaining power by permitting a unilateral invocation of arbitration to also include the unilateral imposition of a no-strike provision," thereby allowing an employer to deprive the Union of its right to strike. Brief of Appellant at 10. This argument is meritless. In a case such as this, the Union accepts the unilateral contract offered by the employer by continuing to work under the terms of the contract. Thus, the employer does not unilaterally impose a no-strike clause, rather the Union's forbearance of its right to strike is the consideration for the arbitration clause in the implied contract
 ABS also argues that the implied interim contract in this case is illusory and unlawful because it is for an unlimited duration. However, the implied interim contract in this case is not illusory. "A labor contract of indefinite duration or one that does not specify a time or manner of termination is terminable at the will of either party upon reasonable notice to the other party." International Union of United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W. v. Randall Div. of Textron, Inc., 5 F.3d 224, 229 (7th Cir.1993) (citing Montgomery Mailers' Union No. 127 v. Advertiser Co., 827 F.2d 709, 715 (11th Cir.1987) and Communications Workers of Am. AFL-CIO v. Southwestern Bell Tel. Co., 713 F.2d 1118, 1123 (5th Cir.1983)).
 
 
 [5]
 However, in its reply brief, filed after the Union pointed out the effect of our decision in United Brotherhood, ABS claimed that had it received notice, it would have taken the depositions of other Union officials "who are more forth-right" than Don Hurr. Reply Brief of Appellant at 10. This amounts to no more than a claim that if given notice of a possible adverse decision, ABS would have engaged in a fishing expedition for favorable evidence
 ABS also points to the testimony of Roger Bernardez, a representative of the United Automobile Workers International Union, who testified at the hearing before the arbitrator. Bernardez testified that the Union did not consider itself bound by the no-strike clause in ABS's "Final Proposal." However, Bernardez also testified that the Union had not engaged in any strike or slowdown after the imposition of the "Final Proposal." Reply Brief of Appellant, Addendum, pp. 43-44.
 Contrary to ABS's assertion, Bernardez's testimony does not rebut the testimony of Don Hurr, and it would not alter the outcome of this case. Bernardez in fact testified that the Union had not engaged in a strike or slowdown since the imposition of the "Final Proposal," testimony which is consistent with the district court's finding that the Union, through its conduct, manifested its intention to abide by the terms of the "Final Proposal." Furthermore, in an effort to claim that it was prejudiced by the lack of notice from the district court, ABS has resorted to citing evidence from the arbitration hearing on grievance A-8700, the very hearing which it sought to have enjoined before the district court.