**INTERNATIONAL LONGSHORE-MEN'S ASSOCIATION, LOCAL UNION NO. 1768, Plaintiff**

v.

**MIDWEST TERMINALS OF TOLEDO INTERNATIONAL, INC., Defendant.**

No. 3:13CV2213.

United States District Court, N.D. Ohio, Western Division.

Filed Sept. 18, 2014.

Joseph C. Hoffman, Jr., Joseph D. Mando, Matthew T. Hurm, Faulkner, Hoffman & Phillips, Cleveland, OH, for Plaintiff.

Ronald L. Mason, Aaron T. Tulencik, Mason Law Firm Co., LPA, Dublin, OH, for Defendant.

## ORDER

JAMES G. CARR, Senior District Judge.

This is a suit under the Labor Management Relations Act, 29 U.S.C. § 141 *et*

*seq.*, to enforce a company's duty to arbitrate a union member's grievance.

The International Longshoremen's Association, Local Union No. 1768 (the Union), alleges defendant Midwest Terminals of Toledo violated its duty under a collective bargaining agreement (CBA) to arbitrate grievances. The Union contends Midwest wrongly refused to arbitrate a grievance that arose after the parties' CBA expired, and before they executed a successor agreement.

Jurisdiction is proper under 29 U.S.C. § 185.

Pending are the parties' counter-motions for summary judgment. (Docs. 13, 14). For the following reasons, I grant the Union's motion and deny Midwest's motion.

### Background

The Union is the exclusive bargaining agent for certain employees at Midwest's ballast dock in Toledo, Ohio.

In 2008, the Union and Midwest agreed to a CBA. Although the parties did not execute the CBA until October 21, 2008, they gave the CBA retroactive effect by making its effective date April 4, 2008. From April to October, the parties had a verbal agreement they would work under the terms and conditions of their prior CBA.

Article IX of the 2008 CBA guaranteed Union members' right to file grievances and appeal unresolved grievances to an arbitrator.

With the 2008 CBA set to expire on March 31, 2012, the Union notified Midwest, in January, 2012, it wished to negotiate a successor CBA.

Negotiations began on March 8. Union President Bill Shrewsbery testified the parties had a verbal agreement that, while negotiations went forward, they would operate under the terms and conditions of the 2008 CBA. The Union's bargaining notes from March 8 also state "work under agreement (current) with retroactive pay understood by both parties." (Doc. 13–4 at 1).

Negotiations continued through November 15, 2012, when the parties reached a tentative agreement. The Union and Midwest ultimately executed the successor CBA on April 15, 2013.

Despite the April, 2013 execution date, the successor agreement stated it was effective from April, 2012, through March, 2014. The successor CBA also contained the same arbitration provision that the 2008 CBA contained.

In mid-January, 2013—before the parties executed the successor CBA—Midwest suspended Union member Farrell Spence from work for five days. The parties met to discuss Spence's suspension, but Midwest ultimately decided to fire Spence.

On February 2, and consistent with the grievance and arbitration rules in the 2008 CBA, Spence reduced his grievance to writing and submitted it to Midwest. In a response that referred to "Article IX of the current collective bargaining agreement between [the Union] and Midwest terminals[,]" Midwest denied that firing Spence had "violate[d] the CBA[.]" (Doc. 13–12).

Two weeks later, the Union informed Midwest it would invoke the arbitration provision of "the current CBA[.]" (Doc. 13–13). Midwest did not object to the Union's proposed action or its characterization of the lapsed agreement as "the current CBA[.]" Rather, Midwest represented—in a letter referring to "Article IX of the current Collective Bargaining Agreement"—it would "abide by the stipulations

in Section 8: Selection of Arbitrator." (Doc. 14–25).

In March, 2013, the parties jointly requested the Federal Mediation and Conciliation Services to propose a list of potential arbitrators. The parties' letter, which both sides signed, began:

> Chris Blakely of Midwest Terminals and William Shrewsberry [sic] of ILA Local 1768 are jointly contacting you to request a list of seven (7) impartial arbitrators as stipulated in [a] collective bargaining agreement.

(Doc. 13–14 at 1).

However, on April 25, 2013—after the parties executed the successor CBA—Midwest told the Union it would not participate in arbitration. According to Midwest, "there was no [CBA] with a binding arbitration clause in effect" when Spence's grievance arose. (Doc. 14–27).

### Discussion

The Union argues it is entitled to summary judgment on its claim that Midwest must arbitrate Spence's grievance.

In support, the Union argues: 1) the parties verbally agreed to operate under the terms and conditions of the 2008 CBA while negotiating the successor CBA; 2) the parties' conduct during the hiatus period created an implied contract to arbitrate; and 3) because the successor CBA is retroactively applicable, it obligates Midwest to submit to arbitration.

Midwest contends it is entitled to summary judgment because: 1) there was no written agreement to operate under the 2008 CBA while negotiating the successor CBA; 2) its conduct during the hiatus period does not suggest it agreed to arbitration, given that federal law required it adhere to certain terms of the 2008 CBA; and 3) the successor CBA is retroactive only with respect to Union members' pay.

A party is entitled to summary judgment under Fed.R.Civ.P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex, supra,* 477 U.S. at 324, 106 S.Ct. 2548.

On summary judgment, I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

### A. The Duty to Arbitrate

■ "Arbitration is a preferred method of settling labor disputes." *Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Network, Inc.*, 17 F.3d 906, 909 (6th Cir.1994).

■ However, "arbitration is a matter of consent," and "[t]he law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 200–201, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991).

■ The duty to arbitrate may arise from several sources: the text of a CBA itself, *see Lattin v. Kurdziel Iron of Rothbury, Inc.*, 1996 WL 33657103, *2 (W.D.Mich.), an oral agreement reached

after the expiration of a CBA, or "conduct manifesting an intention to abide by agreed-upon terms," *Int'l Bhd. of Teamsters v. Pepsi–Cola Gen. Bottlers, Inc.*, 958 F.2d 1331, 1335 (6th Cir.1992).

Because no CBA was in place when Spence's grievance arose, the Union must show any reasonable jury would find: 1) the parties orally agreed to arbitrate the dispute; or 2) the parties' conduct manifested their intent to submit grievance to arbitration.

### 1. Verbal Agreement

■ Even viewing the evidence in the light most favorable to Midwest, it is undisputed the parties verbally agreed to operate under the 2008 CBA while negotiating the successor CBA. Indeed, there is no evidence in the record to rebut the Union President's testimony the parties so agreed.

Midwest's primary response to this evidence is that "[t]he parties did not execute a written extension of the current terms and conditions of employment between the time period the 2008–2012 CBA expired and the successor agreement was ratified and subsequently signed." (Doc. 14 at 4).

■ This is true, but beside the point. "[T]he existence of a labor contract does not depend on its reduction to writing[.]" *Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers Union*, 835 F.2d 1164 (6th Cir.1987). Nor is there a "requirement under federal law for ratification of a collective bargaining agreement by a union." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. UAW v. Loral Corp.*, 1995 WL 943642, *2 (N.D.Ohio).

All that is required is a "meeting of the minds," *Pepsi–Cola, supra*, 958 F.2d at 1335, and no reasonable jury could find Shrewsbery's uncontradicted testimony insufficient to show the parties agreed to abide by the terms of the 2008 CBA.

Midwest also contends Shrewsbery testified the parties' verbal agreement encompassed only the granting of retroactive pay increases once the parties executed the successor CBA.

However, this contention rests on a mischaracterization of Shrewsbery's testimony.

The Union President initially testified that, at the March 8, 2012, negotiating session, "[w]e discussed working . . . under the current agreement with the idea that once an agreement was reached, there would be . . . retroactive pay." (Doc. 13–6 at 30). But Shrewsberry also testified the parties agreed to "retroactive pay, and the current provisions of that current agreement were still in effect" during the hiatus period. (*Id.* at 34).

Contrary to Midwest's claim, Shrewsbery never testified the verbal agreement was limited to the issue of retroactive pay.

Accordingly, there is no genuine dispute of material fact the Union and Midwest agreed to operate under the 2008 CBA's terms while negotiating the successor CBA. Because the 2008 CBA contained an arbitration clause, Midwest was bound to arbitrate Spence's grievance.

### 2. Implied Contract to Arbitrate

I also conclude there is no genuine dispute the parties' conduct created an implied contract to arbitrate Spence's grievance.

■ "In the context of an expired collective bargaining agreement . . . the Court must determine whether the parties intended to arbitrate the dispute[.]" *Pepsi–Cola, supra*, 958 F.2d at 1333. To do so, "the Court need not strictly apply technical rules of contract law[.]" *Id.* at 1335. "However, a meeting of the minds . . .

must still occur before a labor contract is created." *Id.*

Here, the undisputed evidence shows the parties agreed to arbitrate Spence's grievance.

First, during the initial phases of Spence's grievance, both the Union and Midwest adhered to the grievance process set forth in the 2008 CBA.

■ To be sure, mere participation in the grievance process during the hiatus period is, standing alone, insufficient to show Midwest's intent to participate in arbitration. This is so because, under the unilateral-change doctrine, *see NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), Midwest had to participate in the grievance process or risk committing an unfair labor practice, *Flannery Parking Sys., Inc. v. Local 917, Int'l Bhd. of Teamsters*, 1996 WL 403041, *3 (S.D.N.Y.).

■ But here, Midwest did more than participate in the grievance process. It told the Union the grievance rules were part of its "current Collective Bargaining Agreement" with the Union. (Doc. 13–12).

By processing Spence's dispute through the initial phases of the grievance process, and by telling the Union it was doing so because the "current" CBA contained a grievance process, Midwest manifested an intent to follow the grievance and arbitration rules in that CBA. *Loral Corp., supra*, 1995 WL 943642, *3 ("By following through with the steps leading up to arbitration, including the certification of grievances to arbitration, Loral manifested an intent to follow the procedures established in the [CBA]").

Second, and more importantly, the evidence is undisputed Midwest agreed to the Union's initial request to arbitrate Spence's grievance. Not only did Midwest raise no objection to arbitration, but it also

informed the Union it would "abide by the stipulations in Section 8" of the 2008 CBA respecting "Selection of Arbitrator." (Doc. 14–25).

Thereafter, Midwest signed on to a joint request for a list of potential arbitrators.

In taking these actions, moreover, Midwest continued to characterize the 2008 CBA as the "current Collective Bargaining Agreement" governing its relationship with the Union. (*Id.*).

Midwest's conduct provides compelling—indeed, uncontradicted—evidence of its intent to arbitrate Spence's grievance. Importantly, federal labor law did not obligate Midwest to participate in arbitration after the 2008 CBA expired. *Litton, supra*, 501 U.S. at 200, 111 S.Ct. 2215. Nevertheless, Midwest agreed to do so, and told the Union it would abide by the arbitration rules in the parties' "current" CBA.

■ Third, the Union did not strike while the parties negotiated the successor CBA. "Generally, an express or implied no-strike clause is the *quid pro quo* for the employer's agreement to arbitrate grievances." *Loral Corp., supra*, 1995 WL 943642, *3.

Accordingly, the Union's continuous work during the hiatus period supports its claim there was an agreement to arbitrate. *Compare Pepsi–Co., supra*, 958 F.2d at 1333 (fact that union struck during hiatus period demonstrated parties had not agreed to arbitration), *with Aircraft Braking Sys. Corp. v. Local 856*, 52 F.3d 324, 1995 WL 236678, *8–9 (6th Cir.) (fact that union did not strike supported claim it intended to work under expired CBA containing arbitration provision).

Accordingly, I conclude there is no genuine dispute of material fact as to whether the parties' conduct shows their intent to

arbitrate disputes arising during the hiatus period.

### 3. Retroactive Application of Successor CBA

 Finally, there is no dispute the successor CBA contained the same grievance and arbitration rules as did the 2008 CBA. It is also undisputed the successor CBA, though not executed until April, 2013, had an effective date of April 1, 2012.

The plain language of the successor CBA therefore supports the Union's claim Midwest was obligated to arbitrate Spence's grievance.

Midwest does not argue a retroactively applicable arbitration provision is unenforceable.[1] Rather, it argues the parties intended the successor CBA would be retroactive only with respect to pay increases.

However, Midwest cites no language in the CBA to support its claim; it relies entirely on extrinsic evidence to establish this was the parties' intent.

Because the successor CBA is unambiguous as to its effective date—April 1, 2012, before Spence's grievance arose—I cannot consider Midwest's proposed evidence. *Local 377 Chauffeurs, Teamsters, Warehousemen, & Helpers of Am. v. Humility of Mary Health Partners,* 296 F.Supp.2d 851, 860 (N.D.Ohio 2003) ("Absent any evidence of an ambiguous provision in [the CBA] that [the employer] seeks to challenge, the court shall not rely on extrinsic evidence.").

Accordingly, there is no dispute of material fact that the successor CBA's arbitration rules applied retroactively to April 1, 2012, thus obligating Midwest to arbitrate Spence's grievance. Summary judgment

for the Union is therefore appropriate on this basis, too.

### Conclusion

For these reasons, it is ORDERED THAT:

1. The Union's motion for summary judgment (Doc. 13) be, and the same hereby is, granted;

2. Defendant's motion for summary judgment (Doc. 14) be, and the same hereby is, denied;

3. The Clerk of Court shall issue a judgment declaring Midwest is required to arbitrate Farrell Spence's grievance in accordance with the 2008 collective bargaining agreement and the successor bargaining agreement.

So ordered.

---

**1.** The Union has provided authority for enforcing such a provision. *Newspaper Guild of Greater Philadelphia Local 10 v. Cent. States*  *Publ'g Co.,* 451 F.Supp. 1112, 1115–1116 (E.D.Pa.1978) (collecting cases).